**UNITED STATES of America, Plaintiff,**

v.

**Charles Dean ANAYA, Defendant.**

**No. CR. 09–50055–01–KES.**

United States District Court, D. South Dakota, Western Division.

May 27, 2010.

Carolyn G. Olson, U.S. Attorney's Office, Rapid City, SD, for Plaintiff.

George E. Grassby, Federal Public Defender's Office, Rapid City, SD, for Defendant.

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

KAREN E. SCHREIER, Chief Judge.

Defendant, Charles Dean Anaya, is charged with one count of aggravated sexual abuse in violation of 18 U.S.C. §§ 2241(c), 2246(2)(D), and 1153. Anaya moves to suppress statements he made to

law enforcement officers on December 10, 2008, and March 12, 2009. The court referred Anaya's motion to suppress to Magistrate Judge Veronica L. Duffy pursuant to 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing, Magistrate Judge Duffy recommended that this court deny Anaya's motion to suppress. Anaya objects to Magistrate Judge Duffy's factual and legal findings that the December 10, 2008, interview was not a custodial interrogation; that the *Miranda* advisements on March 12, 2009, were complete and accurate; that Anaya's *Miranda* waiver on March 12, 2009, was voluntary, knowing, and intelligent; that Anaya's statements were voluntary; and that Anaya's statements on December 10, 2008, and March 12, 2009, should not be suppressed. The government has no objection to Magistrate Judge Duffy's report and recommendation. After a de novo review of Magistrate Judge Duffy's report and recommendation and a review of the record, the court adopts the report and recommendation as supplemented herein.

## STANDARD OF REVIEW

■ Under 28 U.S.C. § 636(b)(1), "when a party objects to the report and recommendation of a magistrate judge concerning a dispositive matter, '[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.' " *United States v. Lothridge,* 324 F.3d 599, 600 (8th Cir.2003) (quoting 28 U.S.C. § 636(b)(1)); *see also* Fed.R.Civ.P. 72(b) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.").

## BACKGROUND

The court agrees with Magistrate Judge Duffy's detailed and exhaustive findings of fact and adopts them in full. Because Anaya makes a number of factual asser-

tions in his objections to Magistrate Judge Duffy's report and recommendation, the court makes the following findings of fact. Anaya is charged with aggravated sexual abuse of the daughter of his former girlfriend. The inappropriate sexual contact allegedly occurred between 2003 and 2004, when the alleged victim was eleven or twelve years old.

On December 10, 2008, Federal Bureau of Investigation (FBI) agents Charles Blackburn and Sherry Rice went to the Anaya's place of employment, the Cangleska Women's Shelter in Kyle, South Dakota, to interview Anaya about this allegation. Anaya was working outside when the agents arrived. Agent Blackburn approached Anaya, identified himself as an FBI agent, and told Anaya that he would like to talk to him for a few minutes inside the building. Anaya agreed to talk with Agent Blackburn. On the way to the building, Agent Blackburn told Anaya that he was not under arrest and that he would not be arrested at the end of the interview. Agent Blackburn did not notice anything out of the ordinary about Anaya's demeanor and appearance.

When Agent Blackburn and Anaya got inside the building, Agent Blackburn introduced Anaya to Agent Rice and informed him again that he was not under arrest and was not going to be arrested at the end of the interview. Agent Blackburn also informed Anaya that the interview was entirely voluntary, that Anaya did not have to talk to the agents if he did not want to, and that he could leave the interview room at any time. Neither Agent Blackburn nor Agent Rice advised Anaya of his *Miranda* rights. Agent Blackburn did not suggest that Anaya should contact an attorney or inform Anaya of the maximum penalty for the offense alleged against him.

The interview took place in an office inside the Cangleska Women's Shelter.

The room was about ten-feet by ten-feet and contained a small desk and some chairs. It had an exterior window and a door to the rest of the building. The door was unlocked throughout the interview, but Agent Blackburn does not recall if he informed Anaya that the door was unlocked. Agent Blackburn did show Anaya the door of the room. Agent Blackburn was dressed in khaki or cargo pants, a long-sleeved, button-up shirt, and a jacket the morning of the interview. Neither Agent Blackburn nor Agent Rice had their weapons displayed during the interview.

Agent Blackburn explained to Anaya that there had been an allegation of sexual abuse made against him and that the agents would like to speak with him regarding the allegation. At this point, Agent Blackburn noticed that Anaya's hands were shaking. Agent Blackburn asked Anaya about his hands, and Anaya indicated that his hands were trembling because he had consumed too much caffeine that morning. Agent Blackburn continued the interview with Anaya. Anaya told the agents about his relationship with the alleged victim's mother and denied having any kind of sexual contact with the alleged victim. Agent Blackburn and Agent Rice asked Anaya why the alleged victim would make up such an allegation if it were not true, and Anaya did not provide an explanation. Agent Rice asked the defendant if there was anything that may have happened that would cause the alleged victim to think that the defendant touched her in an inappropriate manner. Anaya recalled that he used to engage in tickling matches with the alleged victim's mother and the alleged victim, and that his hands may have gone other places during one of those matches. Shortly after this statement, the interview ended, and Anaya told Agent Blackburn he would continue to think about the time he dated the alleged victim's mother and would call Agent Blackburn if he could remember any further details. Agent Blackburn gave Anaya his business card. Agent Blackburn did not ask Anaya if he would be interested in taking a polygraph exam during this interview.

The interview lasted from about 11:55 a.m. to 12:49 p.m. The agents used conversational tones throughout the interview. Neither agent raised his or her voice or shouted, even when they asked Anaya why the victim would allege that she was sexually abused if it was not true.

Agent Blackburn's next interaction with Anaya was on February 2, 2009. On that day, Agent Blackburn went to a residence located near Kyle, South Dakota, to locate Anaya and to ask him if he was willing to submit to a polygraph exam. Agent Blackburn met with Anaya in the driveway of the residence. They sat in the front seat of Agent Blackburn's car. Agent Blackburn asked Anaya if he would be willing to take a polygraph exam, and Anaya agreed. Agent Blackburn does not remember if Anaya asked what a polygraph exam was or if he explained it. Agent Blackburn did not discuss the admissibility or reliability of a polygraph exam with Anaya. Agent Blackburn denies stating that a polygraph exam is 99 percent accurate. Agent Blackburn asked Anaya if he was taking any medications or had any other medical conditions. Anaya informed Agent Blackburn that he gets panic attacks and previously took an antidepressant, but that he stopped taking it seven years ago. Agent Blackburn told Anaya that he would contact him to arrange the date and time of the polygraph exam. Agent Blackburn was dressed casually and did not display his weapon during this conversation.

Agent Blackburn arranged to conduct the polygraph exam on March 12, 2009, at the Bureau of Indian Affairs (BIA) office in Pine Ridge, South Dakota. He asked

Anaya if he needed transportation from Kyle to Pine Ridge, and Anaya indicated that he would need a ride to Pine Ridge. Agent Blackburn and Anaya met at the Kyle Police Department at about 8:20 a.m. on March 12, 2009. Agent Blackburn greeted Anaya and observed that he was calm. He did not observe any shaking or trembling. Agent Blackburn asked Anaya to ride in the front seat of his car and received Anaya's permission to pat him down to check for weapons. Agent Blackburn patted down the exterior of Anaya's clothing.

Before starting the car, Agent Blackburn informed Anaya that he was not under arrest and would not be arrested at the end of the interview and polygraph exam, that the interview and polygraph exam were entirely voluntary, that Anaya did not have to go with Agent Blackburn, and that if Anaya wished to end the interview or polygraph exam at any time, Agent Blackburn would take him home. During the 50–minute drive, Agent Blackburn and Anaya talked about Anaya's construction work and his time in Roswell, New Mexico. The tone of the conversation was calm and conversational. Anaya was not handcuffed, and Agent Blackburn did not smell any alcohol on Anaya.

Agent Blackburn and Anaya arrived at the BIA office at about 9:14 a.m. and went into the private office where the interview took place at about 9:30 a.m. Agent Blackburn introduced Anaya to Agent Todd Dawson, who was waiting in the interview room. The interview room was a private office within the BIA office on the second floor of the building. The office was approximately eight- to ten-feet by ten-feet and contained a desk and some chairs. The polygraph instrument, which consists of a laptop computer, a digital acquisition

system box, electrodermal activity plates, finger plates, a blood pressure cuff, two pneumograph tubes, and a motion sensor, was on the desk. The office had an exterior window that was covered by a shade. The door was shut throughout the interview and polygraph exam. Agent Blackburn was wearing casual clothing and his weapon was not exposed. Agent Dawson was wearing a suit and tie and did not have a weapon.

Agent Dawson explained that he would be conducting a polygraph exam. He did not discuss the reliability or admissibility of a polygraph exam, and he denies that he told Anaya that the results of a polygraph exam are 99 percent accurate. Agent Dawson observed that Anaya seemed calm, collected, and alert. At the beginning of the interview, Agent Dawson and Anaya sat in the chairs in front of the desk, with Anaya sitting closest to the door, and Agent Blackburn stood in the corner of the room against the wall. Agent Dawson did not smell alcohol or suspect that Anaya had been drinking or using other controlled substances. He did not test Anaya's blood, breath, or urine for controlled substances.

Agent Dawson advised Anaya of his *Miranda* rights by showing him an advice of rights form on the laptop computer. Agent Dawson asked Anaya to read the first line of the advice of rights form aloud to demonstrate that he could read. Anaya did not have any problems reading the line. Then Agent Dawson read each right one-by-one, explained it in other words, and asked Anaya to initial next to each right using a digital signature pad if he understood the right and did not have any questions about it. After initialing each right, Anaya signed the bottom of the form.[1] Then Agent Dawson went over a

1. The advice of rights form says,

Before we ask you any questions, you must understand your rights.

polygraph consent form with Anaya. He read the form out loud, explained that the exam would be about whether Anaya touched the alleged victim's vagina in a sexual manner underneath her clothing, explained Anaya's rights, and had Anaya initial next to each right.[2] Agent Dawson also asked Anaya to initial certain boxes on the form to indicate that Anaya understood that the room did not contain an observation device and that the examination would not be monitored and recorded. Then Anaya signed the bottom of the form. Anaya indicated that he understood the form, and Agent Dawson did not observe anything that made him doubt that Anaya understood the form. Agent Blackburn watched Anaya sign the advice of rights and polygraph consent forms and observed that Anaya did not indicate that he had questions or did not understand his rights. Agent Blackburn perceived Anaya to be calm and relaxed. After Anaya signed both forms, Agent Blackburn left the room.

Agent Dawson continued the "pretest interview" by asking Anaya questions about his background. Anaya indicated that he graduated from high school in 1990 and had worked as a construction worker and carpenter. Anaya also stated that he had chronic shoulder pain, but was not in serious pain at the time of the interview. Anaya stated that he had occasional anxi-

ety attacks, but that he was not having an anxiety attack at the time and had not had any in the past few weeks or months. Anaya said that he had attempted suicide by taking Tylenol tablets in 2001. Anaya stated that his current emotional health was okay and that he was not seeing a psychologist or psychiatrist. Anaya was not taking any over-the-counter drugs and slept seven hours the night before. During this portion of the interview, Agent Dawson did not see anything that would indicate that Anaya was having an anxiety attack. Anaya's hands were not shaking, he answered questions and followed the conversation very well, and he was not sweating. Agent Dawson told Anaya the nature of the charges against him and went over the questions Anaya would be asked during the polygraph exam.[3]

At about 10:37 a.m., Agent Dawson began the polygraph exam. He attached the polygraph components to Anaya. He did not notice any change in Anaya's physical demeanor or behavior. During the exam, Agent Dawson moved behind the desk so that he was out of Anaya's field of vision. Agent Dawson was seated to the side and back of Anaya. Anaya denied touching the alleged victim each time he was asked. Agent Dawson determined that Anaya was being deceptive as to the relevant ques-

---

You have the right to remain silent.
Anything you say can be used against you in court.
You have the right to have a lawyer with you during questioning.
If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.
I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.
Exhibit 1.

**2.** The polygraph consent form advises Anaya of the following rights: "You have the right to refuse to take the polygraph test;" "If you agree to take the polygraph test, you have the right to stop the test at anytime;" and "If you agree to take the polygraph test, you have the right to refuse to answer any individual question." Exhibit 3.

**3.** The relevant questions were, "[d]id you deliberately touch that girl's vagina underneath her clothing?" and "[d]id you deliberately touch that girl's vagina underneath her clothing at Marlene's trailer?"

tions. The exam was completed at 10:56 a.m.

Agent Dawson walked around the desk so he could talk to Anaya face-to-face and informed Anaya that he did not pass the exam. Agent Dawson sat in the chair that he sat in at the beginning of the interview. He did not raise his voice, threaten Anaya, or make any promises to Anaya. Agent Dawson told Anaya that he was not there to judge him and suggested that there may be reasons to explain how the alleged incident happened, such as intoxication. At some point after informing Anaya that he did not pass the exam, Agent Dawson removed the polygraph components. Anaya's demeanor did not change significantly during this conversation, but he looked down and was quiet. He was not shaky. Eventually, Anaya made an admission, and Agent Dawson asked questions to fill in the details of the admission. Agent Dawson denies that he demonstrated on his own body what might have happened or that Anaya asked Agent Dawson what he wanted to hear.

Agent Dawson asked Agent Blackburn to come back into the interview room at 11:45 a.m. Agent Dawson sat in the chair behind the desk, and Agent Blackburn sat in the other chair on the same side of the desk as Anaya about three or four feet away from him. Agent Blackburn did not notice any shakiness or other change in Anaya's demeanor. After Agent Blackburn entered the room, Agent Dawson summarized Anaya's admission for Agent Blackburn. He asked Anaya to correct him if he relayed any information incorrectly. Anaya stated that each piece of information Agent Dawson relayed was true. After ten to fifteen minutes, Agent Blackburn told Anaya that he could produce a written statement, record an oral statement, or do nothing. Anaya said he would like to make a tape recorded statement so that his own words could be heard.

Anaya recorded a statement from 11:59 a.m. until 12:07 p.m. A recording of Anaya's statement was provided to the court. Anaya's voice was steady and calm throughout the recording. Both agents testified that Anaya's demeanor and tone on the tape were representative of his demeanor and tone throughout the interview. At the end of the recording, Anaya was asked how he was treated that day, and he said, "Both of you guys have been pretty well professional about it, if I can say. I was treated fairly." See Exhibit 2. He denied that the agents had made any promises or threats to get him to make a statement. While Anaya was recording the statement, Agent Blackburn did not observe any physical symptoms that indicated to him that Anaya was nervous or having some type of anxiety attack. Agent Dawson did not ask Anaya if he was suffering from an anxiety attack. After Anaya finished making his statement, Agent Dawson told him that he would pass on to the prosecutor the fact that Anaya was cooperative and truthful during the interview.

Agent Blackburn and Anaya left the BIA office at 12:11 p.m. Anaya rode in the front seat of Agent Blackburn's car. Agent Blackburn asked Anaya if there was anything he could remember that narrowed down the time frame of the incident he described in his recorded statement. Anaya explained that the incident must have happened during the spring or summer of 2003 because he remembered loaning the alleged victim's mother a vehicle that day. Agent Blackburn and Anaya did not have any more substantive discussions for the rest of the drive to Kyle. Agent Blackburn observed that Anaya displayed the same tone and demeanor during the

ride home. Agent Blackburn dropped Anaya off in Kyle.

From the time Agent Blackburn picked Anaya up in Kyle until the time he dropped him off, Anaya never asked Agent Blackburn to stop the interview and never asked for an attorney. Neither Agent Blackburn nor Agent Dawson made any threats or promises to Anaya. Agent Blackburn did not say that it was in Anaya's best interest to fully cooperate. There was never any sign that Anaya was nervous, anxious, or shaky. Neither agent informed Anaya of the possible penalties for sexual abuse.

Dr. Stephen Manlove, a psychiatrist, conducted a forensic psychiatric evaluation of Anaya. *See* Exhibit 101. He interviewed Anaya on three separate occasions. Anaya reported that he grew up in and graduated from high school in New Mexico with a 3.2 grade point average. He had a family history of mental illness. Anaya had maintained employment and could function reasonably well as an adult in the working world. Anaya previously took anti-anxiety medications but was not on them at the time of the interviews with law enforcement. He had a history of depression that he managed with work and exercise. He also had problems with anxiety attacks, which began in December 2005. During these attacks, he experienced heart palpitations, shakiness, sweating, and paranoid and lonesome feelings. Anaya reported that he experienced a panic attack during the March 12, 2009, interview. Anaya had been arrested for public intoxication around twenty times, disorderly conduct around ten times, and resisting arrest around five to ten times.

Anaya told Dr. Manlove that Agent Blackburn told him in February 2009 that polygraph exams are 99 percent accurate. Anaya also reported that he had two alcoholic drinks the Monday before the March 12, 2009, interview (which was on a Wednesday). He did not have anything to drink the day before the interview. He slept two to three hours that night. Anaya reports that during the March 12, 2009, interview, Agent Dawson moved and sat two to three feet from Anaya while asking questions about the alleged victim. Anaya reports that at this point, he had a panic attack and felt he had to get the interview over with because he was worried he would faint. He told Agent Dawson what he wanted to hear. Anaya reported that both Agent Blackburn and Agent Dawson were sitting uncomfortably close to him.

At the evidentiary hearing, Dr. Manlove testified in general about false confessions and psychological coercion. Based on his interviews with Anaya, he opined that Anaya falsely confessed because he believed that his guilt had been established beyond any conceivable doubt because he had been told that the polygraph test was 99 percent accurate; because Anaya experienced a panic attack during the interview that made it impossible for him to be in that situation any longer; because Anaya experienced a marked imbalance of power between himself and the two white FBI agents in a government-owned building; and because Anaya felt physically intimidated by Agent Dawson's physical posturing. Dr. Manlove testified that Anaya could have had a panic attack that was not apparent to the FBI agents.

Anaya filed a motion to suppress both his December 10, 2008, and March 12, 2009, statements. Magistrate Judge Duffy recommended that Anaya's motion to suppress be denied because Anaya was not in custody on December 10, 2008, the advisement of rights given to him on March 12, 2009, was complete and accurate, his March 12, 2009, statement was voluntary, and Anaya voluntarily waived his *Miranda* rights on March 12, 2009.

## DISCUSSION

### I. December 10, 2008, Statements

Anaya argues that his December 10, 2008, statements should be suppressed because he was not advised of his *Miranda* rights before the interview. Magistrate Judge Duffy recommended that Anaya's motion be denied because Anaya was not subject to custodial interrogation on this date. Anaya objects to Magistrate Judge Duffy's recommendation, arguing that Anaya was ordered to answer questions and did not feel free to decline, Anaya was never advised of his right to remain silent, the questioning was spearheaded by law enforcement, Anaya was the focus of the investigation, the interview was started and dominated by law enforcement, Anaya was not advised to seek the advice of an attorney, Anaya did not know that the subject matter of the investigation could expose him to a minimum of thirty years in prison, Anaya was interrogated in a closed office by two law enforcement officers of a different race, and the government cannot prove that Anaya was not subject to some physical or mental impairment that led him to believe he was in a custodial setting.

■ *Miranda* requires that an individual be advised of the privilege against self-incrimination and the right to the assistance of counsel prior to questioning when the suspect is (1) subject to interrogation and (2) in custody. *See United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir.1990). The parties agree that the December 10, 2008, interview constituted interrogation. Thus, the only issue is whether Anaya was in custody at the time of the interview. A suspect is in custody if, considering the totality of the circumstances, " 'a reasonable person in the suspect's position would have understood his situation' to be one of custody." *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138,

82 L.Ed.2d 317 (1984)). Common indicia of custody include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.* at 1349. These indicia are not exhaustive and should not be applied ritualistically. *United States v. Brave Heart*, 397 F.3d 1035, 1039 (8th Cir.2005). The Eighth Circuit has said that the " 'most obvious and effective means of demonstrating that a suspect has not been taken into custody' [is] an express advisement that the suspect is not under arrest and that his participation in any questioning is voluntary." *Id.* (quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir.2004)). "No governing precedent of the Supreme Court or [the Eighth Circuit] has yet held that a person was in custody after being clearly advised of his freedom to leave or terminate questioning." *Id.* (internal quotation omitted).

Here, as Magistrate Judge Duffy discussed, Agent Blackburn twice informed Anaya that the questioning was voluntary and that he was not under arrest. He also told Anaya that he did not have to talk to the agents and could leave the interview room at any time. The interview took place in an unlocked office, and Agent

Blackburn showed Anaya the exit before the interview began. Anaya agreed to talk with Agent Blackburn after Agent Blackburn identified himself as an FBI agent. Agent Blackburn and Agent Rice used conversational tones throughout the interview. They did not raise their voices or shout. Although Agent Rice asked Anaya why the alleged victim would make an allegation of sexual abuse if it was not true, this is not the type of strong arm tactic or deceptive strategy that would render the setting custodial. The interview only lasted about 55 minutes. Finally, Anaya was not placed under arrest at the end of the interview. Rather, he indicated that he would think more about the allegation and contact Agent Blackburn if he remembered any further details. These facts all suggest that a reasonable person would not have believed that he was in custody during the December 10, 2008, interview.

■ In light of these facts, with heavy weight given to the fact that Agent Blackburn told Anaya multiple times that the interview was voluntary, that he was not under arrest, and that he was free to leave at any time, the court finds that Anaya's assertions that the interview was spearheaded and dominated by law enforcement, that Anaya did not know that the subject matter of the interrogation could expose him to a minimum of thirty years in prison, that Anaya was interrogated in a closed office by two officers of a difference race, and that Anaya was the focus of the investigation do not show that a reasonable person would have believed that he was not free to leave. Anaya has provided no authority for his assertion that a suspect's lack of awareness of the maximum penalty of a crime (of which the suspect has not been charged) has any bearing on his perception of whether he was free to depart. Rather, Eighth Circuit authority suggests that a suspect's lack of awareness of a certain fact is irrelevant to the question of

whether he was in custody. *See id.* (finding that agent's plan to arrest suspect after the interrogation did not affect the issue of whether the suspect was in custody because the suspect was not aware of the plan). Further, Anaya has not asserted that the racial differences between himself and the agents or his awareness that the alleged victim had made allegations against him contributed to his perception of the interview as coercive or voluntary. "[T]he fact that the individual has become the focus of the investigation is relevant 'to the extent that the suspect is aware of the evidence against him' and this awareness contributes to the suspect's sense of custody." *Griffin*, 922 F.2d at 1348 (quoting *United States v. Carter*, 884 F.2d 368, 370 (8th Cir.1989)). There is no indication that Anaya's awareness of the allegations against him contributed to his sense of custody. "In any event, the fact that the purpose of the questioning is to further focus the investigation on the defendant does not weigh heavily in [the] analysis." *Id.* (internal quotation omitted).

Further, the court finds no evidence to support Anaya's assertions that he was ordered to answer questions and did not feel free to decline or that he may have been subject to some physical or mental impairment that led him to believe he was in a custodial setting. Indeed, Agent Blackburn twice told Anaya that the questioning was voluntary before it began, and Anaya agreed to go forward with the questioning. The only indication that Anaya suffered from a physical or mental impairment was the shaking of his hands. Anaya explained to the agents that his hands were trembling because he drank too much caffeine that day. Finally, Anaya argues that he was in custody because he was not advised of his right to remain silent or that he should seek the advice of an attorney. These facts do not show that Anaya was in custody. Rather, they are rights about

which the agents would have been required to advise Anaya if he actually were in custody. Overall, Anaya's assertions about the December 10, 2008, interrogation do not show that Anaya was in custody during this interview.

Under these facts, the court finds that Magistrate Judge Duffy correctly found that considering the totality of the circumstances, a reasonable person in Anaya's position would not have understood himself to be in custody during the December 10, 2008, interview. Thus, Agent Blackburn and Agent Rice were not required to advise Anaya of his *Miranda* rights prior to questioning him, and the court adopts Magistrate Judge Duffy's recommendation that Anaya's motion to suppress the statements he made in the December 10, 2008, interview be denied. *See Griffin,* 922 F.2d at 1347 (stating that advisement of *Miranda* rights only required where defendant was subject to custodial interrogation).

## II. March 12, 2009, Statements

Anaya argues that his March 12, 2009, statements should be suppressed because he was not properly advised of his *Miranda* rights, he did not voluntarily waive these rights, and his statements were not voluntary. Magistrate Judge Duffy recommended that Anaya's motion to suppress be denied. Anaya objects to Magistrate Judge Duffy's recommendation, making a number of factual assertions about the circumstances of the March 12, 2009, interrogation.[4]

### A. Completeness and Accuracy of Advisement of Rights

 Anaya argues that he was not adequately advised of his *Miranda* rights. *Miranda* requires that prior to any questioning in a custodial setting, the suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The purpose of the warning that anything the suspect says can be used against him in court is to ensure that the suspect is "aware of the privilege against self-incrimination, under[stands] the consequences of waiving this privilege, and recognize[s] the adversarial nature of the proceedings." *United States v. Johnson,* 47 F.3d 272, 277 (8th Cir.1995). *Miranda* does not require a specific warning on the potential sentencing consequences of waiving the rights to remain silent or to be represented by counsel. *Id.; United States v. Peck,* 161 F.3d 1171, 1174 (8th Cir.1998) ("Lack of awareness of the potential adverse impact of statements is not sufficient in itself to invalidate a waiver of the right to counsel.").

 Anaya argues that he was never advised of his *Miranda* rights and that the *Miranda* warnings were incomplete because Agent Blackburn and Agent Dawson did not inform him of the context in which the investigation was taking place, i.e., an investigation of a federal offense carrying a minimum penalty of thirty years in prison. Anaya's assertion that he was never

---

4. Anaya's objections to Magistrate Judge Duffy's report and recommendation regarding the March 12, 2009, statements consist of a general statement of the law regarding the voluntariness of confessions and waiver of *Miranda* rights and a list of nineteen conclusory factual assertions. Anaya did not indicate which facts go to the adequacy and completeness of the *Miranda* advisement, the voluntariness of the confession, and the validity of Anaya's waiver of his *Miranda* rights, so the court is left to guess which facts Anaya believes are relevant to each issue.

advised of his *Miranda* rights is utterly unsupported by the record. According to both agents' testimony, which the court finds credible, Agent Dawson went over the advice of rights form with Anaya one line at a time and explained each of the rights listed on the form. Anaya initialed next to each right as they discussed it. The advice of rights form shows that Anaya was advised that he had the right to remain silent, that anything he said could be used against him in court, that he had the right to seek the advice of a lawyer before he answered any questions, that he had the right to have a lawyer with him during questioning, that a lawyer would be appointed for him if he could not afford one, and if he decided to answer questions without a lawyer present, he had the right to stop at any time. The advice of rights form shown to Anaya encompasses all of the warnings required by *Miranda.* Anaya was also advised that he had the right to refuse to take the polygraph exam, that he had the right to stop the polygraph exam at any time, and that he had the right to refuse to answer any individual question during the polygraph exam. Although the polygraph consent form does not reiterate Anaya's rights to consult with a lawyer and to have a lawyer present during the polygraph exam, the general advisement of rights, provided to Anaya at the same time as the polygraph consent form, adequately informed Anaya that he had a right to consult a lawyer before answering any questions and to have a lawyer present during the upcoming questioning.

■ Anaya's assertion that the advisement of rights was inadequate because he was not advised of the potential federal charges and their minimum penalties is also unavailing. The advisement that anything Anaya said could be used against him in court was sufficient to advise him of the consequences of answering questions without a lawyer. As Magistrate Judge Duffy explained, Agent Dawson was not required to advise Anaya that he was the subject of an investigation that may lead to a federal charge that, if Anaya were convicted of it, would subject him to a minimum sentence of thirty years' imprisonment. *See Peck,* 161 F.3d at 1174; *Johnson,* 47 F.3d at 277. Anaya was completely and adequately advised of his *Miranda* rights at the beginning of the March 12, 2009, interview. Anaya's objections to Magistrate Judge Duffy's recommendation that Agent Dawson accurately and adequately advised Anaya of his rights are overruled.

## B. Voluntariness of Statement

■ Anaya also argues that his March 12, 2009, statements to Agent Dawson and Agent Blackburn were involuntary. Due process requires that confessions be voluntary. *See Brown v. Mississippi,* 297 U.S. 278, 285–86, 56 S.Ct. 461, 80 L.Ed. 682 (1936); *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 225–26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (explaining that voluntary confession may be used against defendant while the use of involuntary confession offends due process). "The appropriate test for determining the voluntariness of a confession is 'whether ... pressures exerted upon the suspect have overborne his will.'" *United States v. Meirovitz,* 918 F.2d 1376, 1379 (8th Cir. 1990) (quoting *United States v. Jorgensen,* 871 F.2d 725, 729 (8th Cir.1989)). A statement is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." *Schneckloth,* 412 U.S. at 225, 93 S.Ct. 2041. On the other hand, "[a] statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. LeBrun,* 363 F.3d 715, 724 (8th Cir.2004).

■ The voluntariness of a confession is judged by the totality of the circumstances. *Id.* Two factors the court must consider are the "conduct of the officers and the characteristics of the accused." *Id.* A statement cannot be rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity. *Colorado v. Connelly,* 479 U.S. 157, 164, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary." *LeBrun,* 363 F.3d at 724. Involuntary statements are inadmissible at trial for any purpose. *Michigan v. Harvey,* 494 U.S. 344, 351, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990).

■ Magistrate Judge Duffy considered all of the facts and circumstances surrounding Anaya's statements, including the three and one-half hour length of the interrogation, the presence of only one agent in the room when Anaya made his first incriminating statement, the advisement that Anaya's participation in the interview was voluntary and that he could leave at any time, Anaya's intelligence and experience with the criminal justice system, Agent Dawson's and Agent Blackburn's clear denial that they commented on the reliability of the polygraph exam, Anaya's statement that he had not had an anxiety attack in the weeks or months before the interview, the lack of outward indications that Anaya began suffering from a panic attack during the interview, the two- to three-foot proximity of the agents to Anaya in the context of the eight- to ten-foot by ten-foot size of the room, Agent Dawson's statement that he would inform the prosecutor that Anaya was cooperative, the racial imbalance between the agents and Anaya, and the inherently coercive nature of law enforcement questioning and a polygraph exam. In light of all these facts, the court agrees with Magistrate Judge Duffy's conclusion that Anaya's statements on March 12, 2009, were the product of an essentially free and unconstrained choice by Anaya. There is no evidence that Anaya's statements were extracted by threats, violence, or express or implied promises sufficient to overbear Anaya's will and critically impair his capacity for self-determination. *See LeBrun,* 363 F.3d at 724.

Anaya objects to Magistrate Judge Duffy's conclusion that his statements were voluntary, arguing that he believed he was not free to leave during the questioning. There is no evidence to support this assertion. Indeed, Agent Blackburn informed Anaya on the drive from Kyle to Pine Ridge that the interview and polygraph exam were entirely voluntary and that if Anaya wished to end the interview or polygraph exam at any time, Agent Blackburn would take him home. Agent Dawson also explained to Anaya that he did not have to answer any questions and could stop answering questions at any time. Moreover, Anaya indicated to the agents that he understood these rights. There is no evidence that Anaya subjectively believed he was not free to leave. Further, even if Anaya did believe that he was not free to leave, there is no evidence that the agents were aware that Anaya believed he could not leave, and there is no evidence that the agents exploited Anaya's belief. *See Connelly,* 479 U.S. at 164, 167, 107 S.Ct. 515 (explaining that statement is not involuntary because of incapacity of the defendant in the absence of some coercive police activity). Similarly, Anaya argues that he was questioned in a custodial setting. The court finds that Magistrate Judge Duffy adequately took the inherently coercive nature of the setting of the interview into account in deciding that based on the totality of the circumstances, Anaya's statements were voluntary.

Anaya also argues that the questioning was spearheaded and dominated by law enforcement, that the agents' interrogation tactics resulted in his free and unconstrained will being overborne, that the polygraph technique created psychological pressures and coercion upon Anaya, that Anaya's statements were acquired by trick, promises, and/or threats, and that the use of the polygraph exam was but one facet of a concerted effort by the agents to improperly coerce Anaya to make statements. The court finds that in light of the calm and conversational tone of the interview and polygraph exam, the agents' statements that the interview was voluntary and could be terminated by Anaya at any time, the lack of physical intimidation or threats by either agent, the lack of promises by either agent, both agents' express denial that they commented on the reliability of the polygraph exam, Anaya's calm demeanor throughout the interview, and the lack of any sign that Anaya was nervous, anxious, or shaky, Agent Dawson's and Agent Blackburn's interrogation tactics were not sufficiently coercive so as to overcome Anaya's capacity for self-determination. Indeed, Anaya stated in the recorded statement that the agents acted professionally and that he was treated fairly. He also denied that the agents made any promises or threats to get him to make a statement. In light of these facts, the court finds that the agents' interrogation tactics did not render Anaya's statements involuntary.

Anaya also argues that the length of the interrogation was such that Anaya's liberty was illegally restrained. The court agrees with Magistrate Judge Duffy that the three and one-half hour length of the interview did not render the circumstances so coercive that Anaya's confession was involuntary. *See Jenner v. Smith,* 982 F.2d 329, 334 (8th Cir.1993) (finding questioning for six or seven hours not per se coercive). Anaya further argues that he

was the focus of the investigation and did not have counsel present. The court finds that these facts, taken in light of the facts as a whole, do not show that Anaya's will was overborne.

Anaya also argues that he was suffering from an anxiety attack during the interview and could not act rationally or voluntarily. Magistrate Judge Duffy considered Anaya's claim that he was suffering from a panic attack at some point during the interview and concluded that Agent Blackburn and Agent Dawson did not engage in coercive activity because there were no outward signs of a panic attack and they were not aware of Anaya's internal experiences. The court agrees with Magistrate Judge Duffy's analysis. Even if Anaya were having a panic attack at the time he made incriminating statements, the government has shown that the agents did not exploit or otherwise take advantage of his mental condition. The law is clear that a statement is not rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity. *Connelly,* 479 U.S. at 164, 167, 107 S.Ct. 515.

Similarly, Anaya claims that the government is unable to show that Anaya was not subject to a physical or mental impairment that overcame and vitiated his knowing, intelligent, free, and voluntary will because they did not perform any testing or investigation into Anaya's mental or physical health. Anaya has cited no authority for his assertion that in the absence of any indication that a suspect is suffering from a physical or mental impairment, law enforcement officers are required to conduct testing for such impairments. Indeed, in the landmark case of *Colorado v. Connelly,* the Supreme Court held that the defendant's confession was voluntary where he approached a law enforcement officer and stated, without any

prompting, that he had murdered someone, despite the fact that it was later discovered that the defendant suffered from schizophrenia and only confessed because of his impairment. *Id.* at 160–62, 107 S.Ct. 515. The officer asked the defendant a few questions, and the defendant denied being under the influence of drugs or alcohol and stated that he had been a patient in several mental hospitals. *Id.* The Supreme Court held that despite the defendant's mental impairment, his confession was voluntary because the officer did not engage in coercive conduct. *Id.* at 166, 107 S.Ct. 515. *Connelly* suggests that law enforcement officers need not conduct testing to determine the physical and mental condition of a suspect in the absence of any indication of a present impairment. Here, Anaya informed Agent Dawson that he had a history of occasional anxiety attacks but that he was not having one at the beginning of the interview and had not had one for the past few weeks or months. Anaya also stated that his current emotional health was okay, he was not in serious pain at the time of the interview, and he had slept seven hours the night before the interview. Anaya did not inform Agent Dawson that he developed anxiety or a panic attack as the interview progressed, and he did not appear shaky or disoriented during the interview. In the absence of any indication that Anaya suffered from a physical or mental impairment that affected his decision to continue answering questions during the interview, the court finds that Anaya's statements were not involuntary because the agents did not perform any tests to determine his mental and physical condition.

Overall, the court agrees with Magistrate Judge Duffy's recommendation that Anaya's March 12, 2009, statements were voluntary. Considering the totality of the circumstances and Anaya's objections to Magistrate Judge Duffy's recommendation, the court finds that the government has shown by a preponderance of the evidence that Anaya's statements were voluntary. Anaya's objections to this portion of Magistrate Judge Duffy's recommendation are overruled.

### C. Waiver of *Miranda* Rights

 Finally, Anaya argues that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights. A criminal suspect may waive his constitutional rights protected by *Miranda.* But the waiver must be voluntary, knowing, and intelligent, that is, it must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and the suspect must have "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Jones,* 23 F.3d 1307, 1313 (8th Cir.1994). The " 'totality of circumstances surrounding the interrogation' " guide the determination of whether a waiver was voluntary, knowing, and intelligent. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

The determination of whether a waiver is voluntary for *Miranda* purposes is determined by the same standard used to determine whether a statement is voluntary for Fifth Amendment due process purposes. *United States v. Makes Room for Them,* 49 F.3d 410, 414 (8th Cir.1995). Thus, for the reasons stated above, the court agrees with Magistrate Judge Duffy's conclusion that Anaya's waiver of his *Miranda* rights was voluntary.

In determining whether Anaya's waiver was knowing and intelligent, Magistrate Judge Duffy considered the language of the advisement of rights, Anaya's high school diploma and 3.2 grade point average, Anaya's statement that he understood his rights, Anaya's discussion with Agent Dawson and Agent Blackburn on a variety

of topics, and Agent Dawson's statement that he was an FBI officer and was there to interview Anaya regarding allegations of sexual abuse and concluded that Anaya did knowingly and intelligently waive his *Miranda* rights. The court agrees with Magistrate Judge Duffy's analysis.

▆▆▆▆▆ Anaya argues that his waiver was not knowing and intelligent because he was not advised about the unreliability of polygraphs as a means of discovering the truth, Agent Dawson's implied conclusion that the polygraph exam would be accurate amounted to a misrepresentation of scientific fact, and Anaya was not told that he could not see the exam results or have them independently evaluated. Assuming these facts are true, they do not show that Anaya's waiver of his *Miranda* rights was unknowing or unintelligent. "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). Rather,

> [t]he Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.

*Id.* Thus, "a valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might ... affec[t] his de-

cision to confess.'" *Id.* at 576, 107 S.Ct. 851 (quoting *Moran*, 475 U.S. at 422, 106 S.Ct. 1135). The Supreme Court has "never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Id.* at 576–77, 107 S.Ct. 851 (internal quotation omitted). Where additional information would "affect only the wisdom of a *Miranda* waiver, not its essential voluntary and knowing nature," the waiver is not invalid. *See id.* at 577, 107 S.Ct. 851.

Here, the court finds that the information Anaya wishes he knew before taking the polygraph exam—that polygraphs are not always reliable, that he would not be able to see a written report of the results of the exam, and that he would not be able to have the exam results independently evaluated—is information that would have been useful in his decision of whether to continue with the interview and polygraph exam, not information that was required for Anaya to make a knowing and intelligent waiver of his *Miranda* rights. Anaya was advised that he could choose not to talk to the agents, could choose to talk only with an attorney present, and could discontinue talking at any time. Anaya was also advised that whatever he said could be used as evidence against him. Anaya initialed next to each of these rights to indicate that he understood them and did not have any questions about them. Neither Agent Blackburn nor Agent Dawson made any affirmative statements about the reliability of the polygraph exam, so Anaya was not misled or tricked into waiving his *Miranda* rights. The evidence shows that Anaya understood all of the information necessary to knowingly and intelligently waive his *Miranda* rights, even though he was not advised of some information that may have affected his cal-

culation of the wisdom of answering questions during the polygraph exam.

▮ Anaya also argues that the *Miranda* warnings were incomplete because the agents did not inform him that they were investigating a federal crime that could expose Anaya to a minimum sentence of thirty years in prison. As noted, Anaya was advised that anything he said could be used against him in court. This warning was sufficient to advise him of the consequences of answering questions without a lawyer, and Agent Dawson was not required to advise Anaya of the nature of the charge being investigated or the possible penalties for that offense. *See Peck*, 161 F.3d at 1174; *Johnson*, 47 F.3d at 277; *see also Spring*, 479 U.S. at 575, 107 S.Ct. 851 (finding that waiver was knowing and intelligent even though defendant was not aware of all possible subjects of questioning in advance of interrogation). Anaya's waiver was not unknowing or unintelligent on this ground.

▮ Anaya also argues that he was suffering an anxiety attack and could not act rationally. Even if the court accepts Anaya's statement to Dr. Manlove that he began suffering from an anxiety attack at some point during the interview, there is no evidence that this anxiety attack affected Anaya's ability to understand his rights or the consequences of his decision to waive these rights and make a statement. Indeed, Anaya's calm and steady tone of voice, logical thought process, and clear statement that he was treated fairly in his recorded statement indicate that Anaya was able to act knowingly and intelligently throughout the interview and polygraph exam, despite any anxiety or panic he was experiencing. Thus, Anaya's assertion that he suffered from an anxiety attack mid-interview does not show that his waiver of his rights to remain silent and to consult an attorney was not knowing and intelligent. *See United States v. Tur-* *ner*, 157 F.3d 552, 555–56 (8th Cir.1998) (finding waiver to be knowing and intelligent where defendant had low IQ and PCP intoxication because he was intelligent enough to understand his rights, was cooperative, initialed each admonition on the waiver form, and gave accurate information). Similarly, Anaya's assertion that the government cannot show that he was not subject to a physical or mental impairment that vitiated his knowing and intelligent will because the agents did not investigate his physical or mental health is unavailing.

▮ Finally, Anaya argues that his waiver of rights prior to submitting to the polygraph examination cannot satisfy the purposes for which the *Miranda* warnings are required when considered in light of the post-polygraph interrogation. The Eighth Circuit has held that "after a (warned) polygraph exam, there is no per se requirement for *Miranda* warnings before (admissible) post exam questioning." *United States v. Black Bear*, 422 F.3d 658, 664 (8th Cir.2005) (citing *Wyrick v. Fields*, 459 U.S. 42, 48–49, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982); *McDowell v. Leapley*, 984 F.2d 232, 234 (8th Cir.1993); *Vasser v. Solem*, 763 F.2d 975, 978 (8th Cir.1985); *United States v. Eagle Elk*, 711 F.2d 80, 83 (8th Cir.1983)). Indeed, it is well established that "[m]erely disconnecting the polygraph equipment" does not remove the knowledge of the rights explained to the defendant before the examination from the defendant's mind. *See Vasser*, 763 F.2d at 978. And the fact that, as here, a new interrogator is involved in the post-polygraph interview does not mean that the suspect is no longer making a knowing and intelligent relinquishment of his rights. *See Black Bear*, 422 F.3d at 664–65. Considering the March 12, 2009, interview and polygraph exam as a whole, the court finds nothing in the circumstances of the post-

polygraph questioning by either Agent Dawson or Agent Blackburn that would vitiate the knowing and intelligent nature of Anaya's pre-polygraph waiver of his rights.

Overall, the court agrees with Magistrate Judge Duffy's recommendation that Anaya's waiver of his *Miranda* rights on March 12, 2009, was voluntary, knowing, and intelligent. Considering the totality of the circumstances and Anaya's objections to Magistrate Judge Duffy's recommendation, the court finds that the government has met its heavy burden of showing that Anaya voluntarily, knowingly, and intelligently relinquished his *Miranda* rights. Anaya's objections to this portion of Magistrate Judge Duffy's report and recommendation are overruled.

Because Anaya was fully advised of his *Miranda* rights on March 12, 2009, he voluntarily, knowingly, and intelligently waived these rights, and his statements on this date were voluntary within the meaning of the Due Process Clause, the court adopts Magistrate Judge Duffy's recommendation that Anaya's motion to suppress his March 12, 2009, statements be denied, as supplemented herein.

Based on the foregoing, it is hereby

ORDERED that the court adopts the Report and Recommendation of Magistrate Judge Veronica L. Duffy (Docket 45) as supplemented herein and, therefore, defendant's first motion to suppress statements (Docket 21) is denied.

## REPORT AND RECOMMENDATION

VERONICA L. DUFFY, United States Magistrate Judge.

### INTRODUCTION

This case is before the court on an indictment charging defendant Charles Dean Anaya with aggravated sexual abuse of a child under the age of 12 in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(D).

Mr. Anaya has filed a motion to suppress his statements to law enforcement. *See* Docket No. 21. The government resists the motion. *See* Docket No. 29. This motion has been referred to this magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

### FACTS

An evidentiary hearing was held on Mr. Anaya's motion on April 14, 2010. Appearing in person at the hearing were Mr. Anaya, his counsel Assistant Federal Public Defender George Grassby, and Assistant United States Attorney Carolyn Olson on behalf of the government. Three witnesses testified at the hearing: (1) Special Agent Charles Blackburn, the Federal Bureau of Investigation ("FBI") case agent assigned to Mr. Anaya's case; (2) Special Agent Todd Dawson, also with the FBI; and (3) Dr. Stephen Manlove, a psychiatrist and defense expert in this case. From that testimony and the documents introduced into evidence at the hearing, the court makes the following findings of fact.

Agent Blackburn is an investigator with the FBI stationed at Rapid City, South Dakota. He has been so employed for the last two years. Prior to that, he was a police officer with the Greenville, South Carolina, Police Department for nine years. He is assigned to investigate violent crimes on the Pine Ridge Indian Reservation in South Dakota. In the course of his duties, Agent Blackburn received a report that Mr. Anaya had sexually abused a female minor under the age of 12. Agent Blackburn had no prior knowledge or acquaintance with Charles Anaya prior to receiving this report.

On approximately December 8, 2008, Agent Blackburn learned that Mr. Anaya was then employed as a carpenter at a women's shelter in Kyle, South Dakota.

Agent Blackburn needed to interview a witness at this same shelter in an unrelated case. Therefore, on December 10, 2008, Agent Blackburn and Special Agent Sherry Rice, also with the Rapid City FBI office, traveled together to the shelter at Kyle.

The administrators at the shelter agreed to make an office available for Agents Blackburn and Rice to use on December 10, 2008, for their interviews. Upon arriving at the shelter, Agent Blackburn asked about Mr. Anaya and was told that he had not yet arrived at work for the day. Accordingly, the agents proceeded with their interview of the other witness first. When they were finished with the witness interview, Agent Blackburn went outside shortly before noon and found Mr. Anaya working.

There were other workers in the vicinity, so Agent Blackburn refrained from stating what the subject of his interview with Mr. Anaya was initially. Instead, he approached Mr. Anaya, identified himself as an FBI agent, showed Mr. Anaya his credentials, and told Mr. Anaya that Agent Blackburn would like to talk to him if he would agree to do so. Agent Blackburn told Mr. Anaya that he was not under arrest, that he would not be placed under arrest that day, and that if he agreed to talk to Agent Blackburn, he would be free to return to work afterward. Mr. Anaya agreed to talk to Agent Blackburn. At this time, Mr. Anaya was friendly toward Agent Blackburn. It was windy and chilly outside and Agent Blackburn thought both he and Mr. Anaya were glad of the opportunity to go indoors.

The two walked to the shelter building together and, once inside out of the hearing of other persons, Agent Blackburn explained to Mr. Anaya that he had been accused of sexual abuse by the daughter of one of his former girlfriends.

Agent Blackburn and Mr. Anaya went to the office at the shelter that had been provided to the agents for their interviews. Once there, Agent Blackburn introduced Mr. Anaya to Agent Rice. Both agents were dressed casually and did not display their weapons at any time. Agent Blackburn at this time repeated to Mr. Anaya that his participation in the interview was entirely voluntary, that he was not under arrest, that he could leave at any time, and that would not be placed under arrest that day. Mr. Anaya said he understood and that he agreed to participate in the interview.

The shelter office that the interview took place in was approximately 10 feet by 10 feet. It had a small desk, some chairs, was well-lit, and had an exterior window and a door. The door was closed as shelter residents and employees were present in the area outside the office, but the door was unlocked during the interview.

Once seated in the office, Agent Blackburn noticed that Mr. Anaya's hands were shaking. He inquired about this, and Mr. Anaya explained that he had drunk too much caffeine that morning and that was why his hands were shaking. Agent Blackburn was the lead agent on this investigation and, accordingly, he asked most of the questions. However, Agent Rice did interject a few questions as well. During the interview, the tone of all parties was conversational. Neither agent ever raised their voices, never threatened, and never made any promises. The interview ended after 54 minutes and the agents returned to Rapid City while Mr. Anaya returned to work. Mr. Anaya made no incriminating statements during this interview, but denied categorically the victim's allegations. Agent Blackburn testified that he was not wholly convinced by Mr. Anaya's denials.

No mention was made of a polygraph examination at the December 10, 2008,

interview. In addition, Agent Blackburn had no acquaintance with Mr. Anaya prior to that date and, aside from his shaking hands, knew nothing about his physical or mental conditions. No *Miranda*[1] warnings were given to Mr. Anaya at any time during the December 10, 2008, interview.

On February 2, 2009, Agent Blackburn contacted Mr. Anaya unannounced at a residence outside of Kyle. There were other persons present in the home, so Agent Blackburn suggested that he and Mr. Anaya speak in Agent Blackburn's vehicle. Both men sat in the front seat of that vehicle. Agent Blackburn explained that the purpose of his contact was to find out if Mr. Anaya would agree to undergo a polygraph examination. Agent Blackburn explained that his job was to seek the truth and that one instrument that helped him find out the truth was a polygraph examination. Mr. Anaya indicated that he would be willing to undergo a polygraph examination.

When asked on cross-examination, Agent Blackburn categorically denied ever making a representation to Mr. Anaya that polygraph examinations were "99% reliable" or any other statement vouching for the accuracy of the test. Agent Blackburn was dressed casually on this occasion and did not display a weapon.

After Mr. Anaya expressed his willingness to participate in a polygraph examination, Agent Blackburn asked him if he was taking any medications as these might affect a polygraph. Mr. Anaya said that he had taken antidepressant medications in the past, but had not taken such medications for seven years. Mr. Anaya also told Agent Blackburn that he sometimes suffered from anxiety attacks.

After this contact with Mr. Anaya, Agent Blackburn contacted Agent Todd Dawson and asked him to come to Pine Ridge to conduct Mr. Anaya's polygraph examination. Agent Dawson is assigned to the Denver FBI office and has been an agent with the FBI for 19 years. He has both his bachelor's degree and a law degree as well as some credit work towards a master's degree in Russian. For the first 13 years with the FBI, Agent Dawson was a full-time case agent on the Wind River Indian Reservation in Wyoming. Thereafter, he was trained as a polygraph examiner and served two years as a part-time case agent and a part-time polygraph examiner. For the last four years, Agent Dawson has been a full-time polygraph examiner. The two agents arranged for Agent Dawson to administer a polygraph examination to Mr. Anaya on March 12, 2009, at the Bureau of Indian Affairs ("BIA") Office in Pine Ridge, South Dakota.

Agent Blackburn called Mr. Anaya on the telephone to tell him the date and location of the exam. Agent Blackburn inquired whether Mr. Anaya would need transportation from Kyle to Pine Ridge for the exam, and Mr. Anaya indicated he would. The two arranged to meet in the Kyle Police Department parking lot on the morning of March 12, 2009.

At 8:20 a.m. on March 12, Agent Blackburn arrived at the meeting spot and Mr. Anaya was there waiting for him. Mr. Anaya appeared calm and composed on this occasion and his hands were not shaking. Agent Blackburn explained that he would like to have Mr. Anaya ride in the front seat of his vehicle with Mr. Blackburn as he thought that would be more comfortable. Agent Blackburn explained that the back seat in his vehicle is separated from the front seating by a barrier. Agent Blackburn asked if he could pat Mr. Anaya down for weapons first. Mr. Anaya

**1.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

agreed, and Agent Blackburn patted him down, finding no weapons. The two then seated themselves in the front seats of Agent Blackburn's vehicle. Mr. Anaya was not restrained with handcuffs or in any other way.

In the vehicle, Agent Blackburn explained to Mr. Anaya that he was not now under arrest, that he would not be arrested on this day, that his agreement to undergo the polygraph exam was entirely voluntary, that he could end the exam at any point, and that if at any time he wanted to leave, he need only tell Agent Blackburn and he would drive him back to Kyle immediately. The two men chatted about Mr. Anaya's work as a carpenter and his previously having lived in Roswell, New Mexico. During this drive and seated in a confined environment at close quarters with Mr. Anaya, Agent Blackburn observed no odor of alcohol and no other indication that gave him pause about Mr. Anaya's ability to understand and comprehend what was happening.

Agent Blackburn and Mr. Anaya arrived at the BIA building in Pine Ridge at approximately 9:15 a.m. Mr. Anaya asked to use the restroom and was accommodated. Afterward, at approximately 9:30 Agent Blackburn took Mr. Anaya to meet Agent Dawson in an office on the second floor of the building. The office was located inside a "squad room" or "bull pen" used by BIA law enforcement officers. The office was approximately 10 feet by 10 or 8 feet, with a desk, one chair behind the desk, and two chairs in front of the desk. The desk was located to the left of the door and the two chairs in front of the desk were next to the door. There was an exterior window the shades on which were closed.

Agent Dawson was dressed in a suit and tie and had no weapon. His polygraph machine was sitting on top of the desk. It consisted of a laptop computer, a small box called a Digital Acquisition System

("DAS"), and several leads connected to the DAS attached to finger plates, a blood-pressure cuff, a motion detector pad which the interviewee sits on, and chest pads.

Agent Blackburn introduced Mr. Anaya to Agent Dawson. The door to the office was open during this period of time. Agent Dawson testified that Mr. Anaya appeared attuned, alert, and paying attention. Agent Dawson sat in one of the chairs in front of the desk and Mr. Anaya sat in the other chair closest to the door, while Agent Blackburn remained standing, looking over the two men's shoulders.

Agent Dawson went over an advice of rights form with Mr. Anaya which was on his laptop computer. *See* Exhibit 1. The following is a verbatim recitation of the rights set forth on Exhibit 1:

### YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

*See* Exhibit 1.

Agent Dawson first asked Mr. Anaya to read the first line of the form under the heading "YOUR RIGHTS," which Mr. Anaya did with no problem or hesitation. Agent Dawson then read the rest of the form out loud to Mr. Anaya, offering additional explanation after each line in order to make sure Mr. Anaya knew what the

form was stating. For example, after being advised that he had a "right to remain silent," Agent Dawson explained that that right meant that Mr. Anaya's participation in the exam was entirely voluntary, that he did not have to speak to either agent at all. Throughout the reading of the form, Agent Dawson asked Mr. Anaya if he had any questions. Mr. Anaya never indicated that he was confused or did not understand. He never asked any questions. Agent Dawson observed no shaking or tremors from Mr. Anaya. Agent Dawson asked Mr. Anaya to initial each of the rights on the form if he understood it. Mr. Anaya initialed every statement of rights on the form.[2] Mr. Anaya then signed the form at the bottom, and the two agents signed at the bottom as witnesses. It took Agent Dawson and Mr. Anaya approximately five minutes to go over all of Exhibit 1.

Agent Dawson then went over a consent to interview with polygraph form with Mr. Anaya in the same way as Exhibit 1. *See* Exhibit 3. Exhibit 3 advised Mr. Anaya that the purpose of the polygraph was to explore "whether or not you touched [name redacted] vagina in a sexual manner underneath her clothing." *Id.* The form went on to state that "[y]ou have the right to refuse to take the polygraph test." *Id.* This statement is initialed by Mr. Anaya. *Id.* The form advised Mr. Anaya that if he agreed to take the polygraph test, he had the right to stop the test at any time. *Id.* This statement is also initialed by Mr. Anaya. *Id.* The form also advised Mr. Anaya that if he agreed to take the test, he had the right to refuse to answer any individual question. *Id.* Again, Mr. Anaya initialed the statement. *Id.* Exhibit 3 also contained a statement that Mr. Anaya had read Exhibit 3, that he understood his rights, that he agreed to be examined by

polygraph, and that no threats or promises had been made to get him to agree to the polygraph. *Id.* Mr. Anaya initialed statements that he understood that the room had no observation devices and that the examination would not be monitored or recorded. *Id.* Mr. Anaya signed the form at the bottom. *Id.* Agent Dawson's signature appears in the blank marked "Examiner," and Agent Blackburn's signature appears as a "witness." It took approximately 5 minutes for the agents to review Exhibit 3 with Mr. Anaya.

After Mr. Anaya had signed Exhibits 1 and 3, Agent Blackburn left the office and the door to the office was closed. The time was approximately 9:40 a.m. Agent Dawson then engaged in what he called a pre-test interview with Mr. Anaya. He first filled out a polygraph examination worksheet. *See* Exhibit 4. In doing so, Agent Dawson asked Mr. Anaya a number of questions about himself unrelated to the allegations of sexual abuse. *Id.* In response to these questions, Mr. Anaya told Agent Dawson he had graduated from high school at Roswell, New Mexico, in 1990, and was currently 37 years old. *Id.* He told Agent Dawson that he had been employed as a carpenter at the women's shelter in Kyle since July, 2008; before that as a construction worker in Fort Pierre, South Dakota, for two months; and before that as a construction worker at a college in Kyle for five months. *Id.*

In response to Agent Dawson's questions, Mr. Anaya described his health as good, but stated that he had chronic shoulder pain as a result of a motor vehicle accident in August, 2008. *Id.* Agent Dawson asked Mr. Anaya if he was currently experiencing this pain, and Mr. Anaya said he was not.[3] Mr. Anaya told Agent Dawson that he occasionally experienced anxi-

---

2. There was a stylus that allowed Mr. Anaya to initial the form digitally.

3. This information was testified to orally by Agent Dawson, under oath, but is not noted

ety attacks. *Id.* Agent Dawson asked Mr. Anaya if he was currently experiencing such an attack or if he had experienced any such attacks recently, to which Mr. Anaya responded he was not currently having an anxiety attack, and had not had any such attacks in the previous few weeks or months. Mr. Anaya stated that he had not taken any prescription or over the counter drugs in the last 24 hours. *Id.*

Mr. Anaya also told Agent Dawson that he had attempted suicide in 2001 by taking an overdose of Tylenol, but that he was not currently under the care of a psychologist or psychiatrist. *Id.* Mr. Anaya told Agent Dawson that he had attempted suicide as a result of the death of his father, his break-up with a long-time girlfriend, and his brother's suicide. Agent Dawson asked Mr. Anaya about his mental state that day, and Mr. Anaya responded that he was "ok." Mr. Anaya said that he had had seven hours of sleep the night before. *Id.*

Mr. Anaya told Agent Dawson that he had approximately 20 tribal arrests for public intoxication, three tribal arrests for resisting arrest, and one tribal arrest for driving while under the influence. *See* Exhibit 4. Mr. Anaya related that he had never been arrested for a felony or for any federal crime. *Id.*

During this pre-polygraph interview, Agent Dawson testified that he observed no signs that Mr. Anaya was experiencing an anxiety attack at the time. Mr. Anaya was not shaking, sweating, showing increased perspiration, and was tracking the conversation at all times. Agent Dawson testified that he never discussed with Mr.

Anaya either the accuracy or the admissibility in court of the results of a polygraph exam.

Agent Dawson then told Mr. Anaya that the victim first reported the abuse in October, 2008, that it involved multiple incidents occurring approximately 5½ years earlier when the victim was 11 and 12 years old. Agent Dawson shared with Mr. Anaya that the polygraph exam consisted of two "relevant questions" about the victim's accusations, interspersed with other questions that would be unrelated to the allegations. Agent Dawson shared with Mr. Anaya exactly what each of the relevant questions were, word by word, stopping to define what each word in the question meant if it was at all subject to any ambiguity. Agent Dawson also explained that the relevant questions would be repeated several times, in different orders each time.

Agent Dawson then conducted a "practice test" with Mr. Anaya where Mr. Anaya wrote down a number on a piece of paper. Agent Dawson then hooked Mr. Anaya up to the equipment and asked some questions, with some of the questions having to do with the number on the piece of paper.

Agent Dawson then conducted the polygraph exam regarding the victim's allegations in this case. He ran three charts, and each time Mr. Anaya denied the victim's allegations when the two relevant questions were asked. Agent Dawson scored the charts and determined that Mr. Anaya was being deceptive as to the relevant questions.[4] The polygraph exam end-

---

on Exhibit 4. Agent Dawson testified that he inquired about the level of pain Mr. Anaya was experiencing that day because acute pain can sometimes interfere with the results of a polygraph examination by preventing the interviewee from concentrating on the questions being asked.

In the next passages in the text of this opinion, if a statement is followed by a cita-

tion to Exhibit 4, the information is documented there. If no such citation is present, the information was testified to orally by Agent Dawson, but was not noted in writing on Exhibit 4.

4. The test results were reviewed by an FBI supervisor, who agreed that the test showed deception as to the relevant questions.

ed at 10:56 a.m. and the equipment was removed from Mr. Anaya. At no time during the exam did Agent Dawson observe any change in Mr. Anaya's behavior, appearance, or demeanor. Agent Dawson testified that Mr. Anaya was alert and cooperative at all times.

Agent Dawson at this time told Mr. Anaya that he had not passed the test. Agent Dawson began discussing with Mr. Anaya at this time what had happened. Agent Dawson testified that the conversation centered around why the incident might have happened, for example, if Mr. Anaya had been intoxicated at the time. On cross-examination, Agent Dawson denied that he had supplied details of the victim's allegations to Mr. Anaya in this portion of the interview, but rather insisted that the conversation centered around possible justifications or extenuating circumstances that might mitigate Mr. Anaya's behavior in his own mind. Agent Dawson testified that he never raised his voice, never made any threats, and never made any promises. He did advise Mr. Anaya that Agent Dawson was not there to judge him morally, that sometimes people do things when they are drinking that they would not do when they were sober.

During this post-test interview, Agent Dawson testified that at times Mr. Anaya looked down and was quiet, but that at other times he looked Agent Dawson in the eye. He never exhibited any shaking or other outward sign of stress or anxiety. Mr. Anaya then made an incriminating statement.

At approximately 11:45 a.m., Agent Dawson opened the door to the office and invited Agent Blackburn back in. Agent Blackburn sat in the chair next to Mr. Anaya in front of the desk, with Mr. Anaya being in the chair closest to the door, and Agent Dawson sitting behind the desk. Agent Dawson summarized for Agent Blackburn the admission Mr. Anaya had made, stating to Mr. Anaya to correct him at any time if he said anything wrong.

After Agent Dawson summarized Mr. Anaya's admission, Agent Blackburn told Mr. Anaya he had three choices. He could write out his statement in his own words in his own handwriting, he could make an audio recording of his statement in his own words, or he could do nothing. Mr. Anaya indicated that he wanted to make an audio recording so that his words could be heard. At 11:59 a.m., the agents began tape recording Mr. Anaya's statement. That recording was introduced at the hearing on this motion as Exhibit 2. Both agents testified at the hearing that tone and demeanor of the agents and Mr. Anaya as recorded on Exhibit 2 are representative of the tone and demeanor of all three men throughout the interview. On the tape, when asked how he had been treated, Mr. Anaya is heard to say "Both of you guys been pretty well professional." *See* Exhibit 2. The taped interview ended at 12:07 p.m. Mr. Anaya and Agent Blackburn left a few minutes later.

Mr. Anaya and Agent Blackburn traveled back to Kyle together in the front seat of Agent Blackburn's vehicle. During the trip, Agent Blackburn asked Mr. Anaya if there were any other details related to his admission that he could remember that might help the agents determine the time frame of the incident described by Mr. Anaya. Mr. Anaya related an additional fact that helped determine the time frame of the incident to which he had admitted.

At no time on March 12, 2009, did either Agent Dawson or Agent Blackburn ever make any threats or promises to Mr. Anaya. They did tell Mr. Anaya that the results of the exam and the fact of his cooperation in the investigation would be passed along to the United States Attor-

ney's Office. At no time did Mr. Anaya exhibit any signs of nervousness.

At no time during any contact between Mr. Anaya and any agent was the subject discussed of the potential penalties. that Mr. Anaya might face if the victim's allegations were substantiated. At no time during any encounter between Mr. Anaya and any agent did Mr. Anaya indicate a desire to leave, a desire to terminate the conversation, or a desire to have the assistance of a lawyer. Both agents testified that if Mr. Anaya had so indicated at any time, they would have immediately stopped talking to Mr. Anaya.

On cross-examination, Agent Dawson testified that sometimes suspects do pass the polygraph examination and, if they do, he tells them they have passed. He related that he recently conducted a polygraph test on a suspect from Pine Ridge who passed the test. Agent Dawson reported the results to the United States Attorney's Office and the investigation was closed without any charges being asserted against the subject.

Dr. Stephen Manlove is board-certified in psychiatry, internal medicine, and forensic psychiatry. *See* Exhibit 102. He has degrees from the University of Minnesota Medical School, the Harvard University Divinity School, and St. Olaf College. *Id.* He completed a five-year residency in psychiatry and internal medicine at the University of Virginia Medical Center and has been in private practice as a psychiatrist in Rapid City, South Dakota, since 1987. *Id.*

Mr. Anaya's counsel hired Dr. Manlove to conduct a forensic psychiatric evaluation of Mr. Anaya. *See* Exhibit 101. In order to conduct that evaluation, Dr. Manlove reviewed a number of sources of information in forming his opinions in this case, including the victim's interview with the BIA; a record of a forensic interview with the victim; a letter from Mr. Anaya addressed "to whom it may concern;" the

FBI investigative report in this matter; a witness interview with the BIA; Mr. Anaya's medical records from the Kyle clinic from October 25, 2002, to May 22, 2009; and behavioral health records of Mr. Anaya from August 26, 2002, to August 30, 2002. *Id.*

In addition to these sources of information, Dr. Manlove interviewed Mr. Anaya on three occasions in early 2010. *Id.* Although Mr. Anaya did not testify at the evidentiary hearing in this matter, his hearsay statements in his interviews with Dr. Manlove are recorded in Dr. Manlove's report. *See* Exhibit 101. In addition to the information introduced into evidence through Agents Blackburn and Dawson, Dr. Manlove's report reveals the following information gleaned from Mr. Anaya.

Mr. Anaya told Dr. Manlove that he had graduated from high school with a 3.2 grade point average. *See* Exhibit 101, page 3, ¶ 11. He also reported that he had served in the National Guard from 1990 to 1992. *Id.* at 3, ¶ 13. Mr. Anaya told Dr. Manlove that he has had periodic problems with depression since 2002, but that he has not sought treatment due to his work obligations. *Id.* at 5, ¶ 17.C. He told Dr. Manlove that he began to experience anxiety attacks in December 2005. *Id.* He described his symptoms with these attacks as feelings of intense fear coupled with palpitations, diaphoresis, paranoia that people would come after him, and a lonesome feeling. *Id.*

Mr. Anaya then described to Dr. Manlove his March 12, 2009, interview with Agents Blackburn and Dawson. *Id.* at 6, ¶ 19. Mr. Anaya told Dr. Manlove that, when the FBI asked if he would agree to submit to a polygraph exam, they told him that "polygraphs are 99 percent accurate" and that if the polygraph showed that Mr. Anaya was telling the truth, the FBI would "stop bothering him." *Id.*

Mr. Anaya told Dr. Manlove that he had not had any alcohol to drink for 36 to 48 hours before the polygraph. *Id.* He told Dr. Manlove that he had only slept two to three hours the night before because he was anxious about the polygraph. *Id.* Mr. Anaya reported to Dr. Manlove that Agent Dawson sat about two to three feet away from him during the polygraph when he questioned Anaya, a distance that Mr. Anaya perceived to be "uncomfortably close." *Id.* Mr. Anaya told Dr. Manlove that when Agent Dawson began questioning him specifically about the details of the victim's allegations, "his anxiety increased dramatically and he had one of his fairly typical panic attacks with the somatic symptoms, which are described in [¶] 17C." Mr. Anaya told Dr. Manlove that he felt he "had to get it over" [i.e. the interview] because he was afraid he would faint. *Id.* Mr. Anaya said he finally just told Agent Dawson "what he wanted to hear" in order to escape the interview. *Id.* Mr. Anaya said that he elected to make an audio recording of his statement rather than hand writing a statement because he was "too tremulous to write." *Id.*

From his review of the above information, Dr. Manlove formed the opinion that the confession made by Mr. Anaya on March 12, 2009, was a false confession. Dr. Manlove explained that a false confession is usually composed of two parts: the confession itself and the post-confession narrative in which the suspect supplies the details in support of the confession. In support of his opinion, Dr. Manlove noted that persons who suffer from unusual anxiety such as Mr. Anaya are more susceptible to feeling coerced into making a false confession. In addition, Dr. Manlove testified that the FBI agents in this case did not act deliberately to coerce Mr. Anaya into making a confession nor did they act deliberately to exploit his anxiety attacks. Importantly, Dr. Manlove testified that one would not necessarily know by out-

ward appearance whether another person was having a panic attack. However, Dr. Manlove stated that the interview was "coercive, at least to his [Mr. Anaya's] understanding."

In support of his opinion that Mr. Anaya found the interview coercive, the single greatest factor to Dr. Manlove was Mr. Anaya's belief that the polygraph test was infallible. In addition, Dr. Manlove pointed out other subtly-coercive elements of the interview, including the fact that the building in which the interview took place was federally-owned, there was a guard outside the door (i.e. Agent Blackburn), the two agents were Caucasian and Mr. Anaya was Native American, the agents sat uncomfortably close, the agents offered rationalizations, the agents promised leniency, and Mr. Anaya was suffering from an anxiety attack.

Mr. Anaya now moves to suppress his statements made on December 10, 2008, and on March 12, 2009. The government resists this motion.

## DISCUSSION

### A. Mr. Anaya Was Not In Custody When He Was Interrogated on December 10, 2008

Mr. Anaya's sole argument in support of suppressing his December 10, 2008, statement to the agents was that he was "in custody" on that occasion, necessitating the advisement of his *Miranda* rights. Since the agents did not advise Mr. Anaya of his *Miranda* rights on this date, Mr. Anaya argues that his statement should be suppressed.

The holding of the *Miranda* case "is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." *United*

*States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir.1990) (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). *Miranda* warnings protect an individual's Fifth Amendment privilege against self-incrimination by "ensuring that a suspect knows that he may choose not to talk to law enforcement, to talk only with counsel present, or to discontinue talking at any time." *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). A *Miranda* warning is required prior to questioning whenever two conditions are present: (1) the suspect is being interrogated and (2) the suspect is in custody. *Unites States v. Flores–Sandoval*, 474 F.3d 1142, 1146 (8th Cir.2007); *Griffin*, 922 F.2d at 1347; *United States v. Carter*, 884 F.2d 368, 371 (8th Cir.1989).

■■■ Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Here, neither party disputes that Mr. Anaya was being interrogated on December 10, 2008, and neither disputes that he was not advised of his *Miranda* rights. Therefore, whether Mr. Anaya's statements should be suppressed hinges on whether Mr. Anaya was in custody at that time, thereby requiring the administering of *Miranda* warnings.

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government. *See United States v. Charbonneau*, 979 F.Supp. 1177 (S.D.Ohio 1997). Other courts have placed the initial burden on the defendant to prove that he was "in custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden. *See United States v. Moore*, 104 F.3d 377, 391 (D.C.Cir.1997). The Eighth Circuit appears not to have addressed this issue yet,

although some district courts within the circuit have. *See e.g. United States v. Morriss*, 2006 WL 3519344 (W.D.Mo.2006) (placing initial burden on defendant and citing to extra-circuit cases for authority). For purposes of this report and recommendation, the court has placed the burden of proving that Mr. Anaya's statements were *not* the subject of custodial interrogation on the government.

■■■ A suspect is considered to be "in custody" either upon his or her formal arrest or "under any other circumstances where the suspect is deprived of his" or her "freedom of action in any significant way." *Griffin*, 922 F.2d at 1347 (citing *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). Absent formal arrest, a suspect is deemed is be "in custody" where a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a "degree associated with formal arrest." *Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138; *United States v. Black Bear*, 422 F.3d 658, 661 (8th Cir.2005); *Griffin*, 922 F.2d at 1347; *Carter*, 884 F.2d at 370. The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator. *Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138; *Black Bear*, 422 F.3d at 661; *Griffin*, 922 F.2d at 1347; *Carter*, 884 F.2d at 370. In determining whether a suspect reasonably believed himself or herself to be in custody, the court examines the totality of the circumstances. *Carter*, 884 F.2d at 370 (citing *United States v. Lanier*, 838 F.2d 281, 285 (8th Cir.1988) (per curiam)).

■■■ Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency: (1) whether the suspect was informed that he was free to leave and that answering the interrogator's questions was voluntary; (2)

whether the suspect possessed freedom of movement during the interrogation; (3) whether the suspect initiated contact with the interrogator or voluntarily acquiesced in the interrogation; (4) whether the interrogator employed strong-arm tactics or strategies; (5) whether the atmosphere of the interrogation was dominated by the police; and (6) whether the suspect was arrested at the close of the interrogation. *See United States v. Flores–Sandoval,* 474 F.3d 1142, 1146–47 (8th Cir.2007) (citing *Griffin,* 922 F.2d at 1349). Reference to these factors is helpful, but these factors are not exclusive and custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *Flores–Sandoval,* 474 F.3d at 1147. In addition, the place where the interrogation took place, the purpose of the interrogation, the length of the interrogation, and other factors are also to be considered. *Griffin,* 922 F.2d at 1348; *Carter,* 884 F.2d at 370.

In *United States v. Czichray,* 378 F.3d 822, 827 (8th Cir.2004), the Eighth Circuit cautioned the *Griffin* factors are by no means exhaustive and should not be applied "ritualistically." The Court emphasized "an express advisement that the suspect is not under arrest and that his participation is voluntary" is the most obvious and effective means of demonstrating he has not been taken into custody. *Id.* at 826. Nonetheless, the *Griffin* factors still appear in Eighth Circuit case law after *Czichray,* and continue to be cited with approval for determining the custody issue. *See e.g. United States v. Plumman,* 409 F.3d 919, 923 (8th Cir. 2005).

■ Whether a suspect was the focus of an investigation at the time the interrogation takes place is of little significance unless that fact was communicated to the suspect and that fact contributed to the suspect's reasonable conclusion of not being free to go. *Griffin,* 922 F.2d at 1348; *Carter,* 884 F.2d at 370 (citing *United States v. Jimenez,* 602 F.2d 139, 145 (7th Cir.1979)).

Courts have given substantial weight to an interrogator's advising a suspect that no arrest is being made or will be made at the time of questioning, and that the suspect is free to decline to answer questions or to terminate the interrogation at any point the suspect so chooses. *Griffin,* 922 F.2d at 1349–50.

The court in *United States v. Johnson,* 64 F.3d 1120, 1125–26 (8th Cir.1995), found that the suspect was not in custody even though he was questioned in the back of a patrol vehicle. Specific factors which lead the court to its conclusion were that the suspects were specifically advised that they were not under arrest, they were not handcuffed or otherwise restrained while in the squad car, they were not isolated, their passengers remained at the scene, no strong arm tactics were employed, the questioning was straightforward, and the officer who questioned the suspects was not in uniform.

■ Here, the court concludes that Mr. Anaya was not in custody during the December 10, 2008, interview and, thus, that *Miranda* advisements were unnecessary. The interview took place at Mr. Anaya's place of work, not the police station. He was not physically restrained in any way. The agents were dressed in street clothes and did not display their weapons. The questioning was low-key and conversational. Most importantly, while still outside the shelter, Mr. Anaya was told he did not have to talk to the officers, he was not under arrest, and he would not be arrested that day. As further evidence that Mr. Anaya did not feel intimidated or pressured by the agents on this day, the court notes that he made no

incriminating statements this day. A reasonable person in Mr. Anaya's position would have felt free to decline to talk to the agents and free to leave the interview at any time. Accordingly, the court recommends that Mr. Anaya's motion to suppress his December 10, 2008, statement be denied.

**B. Whether Mr. Anaya's March 12, 2009, Statement Should Be Suppressed**

Mr. Anaya makes three arguments in support of the suppression of his March 12, 2009, statement. First, he argues that the advisement of *Miranda* rights given to him was incomplete and incorrect. Second, he argues that his waiver of his *Miranda* rights was not valid. Third, he argues that his statement itself was coerced. The court addresses these arguments individually.

**1. Whether the Advisement of Rights Was Complete and Accurate**

Mr. Anaya argues that the advice of rights given to him by Agent Dawson was incorrect and/or incomplete. The advisement of rights given by Agent Dawson was by no means incorrect or incomplete. The *Miranda* Court required that, prior to custodial interrogation, a suspect must be advised "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 445, 86 S.Ct. 1602. Agent Dawson's advisement left nothing out, nor did it state anything incorrectly.

Mr. Anaya argues that Agent Dawson never told him that he could be subject to prosecution for a federal felony nor what the potential penalty for that felony might be should Mr. Anaya be convicted. The Eighth Circuit has rejected the argument "that Miranda requires a specific warning on the potential sentencing consequences

of waiving the right to remain silent." *United States v. Johnson*, 47 F.3d 272, 277 (8th Cir.1995). "[T]here are no magic words that automatically satisfy *Miranda's* constitutional concerns. Instead, the appropriate inquiry is whether the warning that [defendant] received reasonably conveyed his constitutional rights as required by *Miranda*." *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir.2005) (citations omitted). Because the *Miranda* Court "did not prescribe an exact format or postulate the precise language that must be used in advising a suspect of his constitutional right to remain silent ..., the substance and not the form of the warnings should be of primary importance." *Tucker v. United States*, 375 F.2d 363, 369 (8th Cir.1967).

The advisement of rights given in this case encompassed everything required by *Miranda*. *See Miranda*, 384 U.S. at 445, 86 S.Ct. 1602. Agent Dawson was not required to specifically advise Mr. Anaya of the potential of federal, as opposed to state or tribal, criminal charges. The court notes, further, that the reason for the rule that interrogators do not have to tell suspects of the charges they are going to be facing and the exact penalties for those charges is easily understood: until the investigation is complete, it is nearly impossible for police in Agent Dawson's position to determine what federal charges, if any, are supported by the evidence and what penalties could result, especially in view of the fact that the *Miranda* advisement takes place *before* the defendant makes a statement to police. The court concludes that Agent Dawson accurately and adequately advised Mr. Anaya of his rights.

**2. Whether Mr. Anaya's March 12, 2009, Statement Was Voluntary**

Mr. Anaya argues that his statement was involuntary because he did not feel

free to decline to answer the agents' questions, the questioning was spearheaded and dominated by law enforcement, he was the focus of the investigation, he was told not to seek the advice of an attorney, he had no attorney accompanying him, he was unaware of the potential prison sentence he faced, the FBI took no steps to determine whether he was sober enough to answer questions, and that he was not well educated in legal matters nor was he legally sophisticated.

The Supreme Court has stated that, under the Due Process Clause of the Fifth and Fourteenth Amendments, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). "In considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." *United States v. Pierce*, 152 F.3d 808, 812(8 th Cir.1998). The court must look to the totality of the circumstances, "including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure." *Id.* The burden of demonstrating that a defendant's statement was voluntary rests with the government, which must prove voluntariness by at least a preponderance of the evidence. *Missouri v. Seibert*, 542 U.S. 600, 608 n. 1, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).

### a. Colorado v. Connelly

The landmark Supreme Court case on the topic of voluntary confessions is *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In *Connelly*, defendant Francis Barry Connelly approached a police officer and, without any prompting, stated that he wanted to confess to a murder. *Id.* at 160, 107 S.Ct. 515. The officer immediately advised Connelly of his *Miranda* rights and asked him if he had been drinking or taking any drugs. *Id.* Connelly denied taking any mind-altering substances but stated that, in the past, he had been a patient in several mental hospitals. *Id.* Connelly then spoke to a homicide detective, who again advised him of his *Miranda* rights, and Connelly confirmed that he understood those rights. *Id.* Connelly then confessed to the murder of a young girl that he claimed to have committed approximately nine months earlier, telling the officer the location where the murder took place. *Id.* A check of police records revealed that the body of an unidentified female had been discovered four months earlier in the location identified by Connelly. *Id.* At no time did the homicide detective who took Connelly's confession observe any indication that Connelly was suffering from any kind of mental illness. *Id.* at 161, 107 S.Ct. 515.

The next day, Mr. Connelly became visibly disorientated and was sent to a state hospital for evaluation, where a psychiatrist diagnosed him with chronic schizophrenia manifested through "command hallucinations" that interfered with his ability to make free and rational choices. *Id.* at 161, 107 S.Ct. 515. Mr. Connelly stated that the "voice of God" instructed him either to confess to the murder or to commit suicide. *Id.* The psychiatrist confirmed that, although Mr. Connelly's psychosis did not impair his cognitive abilities, that is, he was able to intellectually understand his *Miranda* rights, his psychosis did motivate his confession. *Id.*

Based on this evaluation, the Colorado trial court found that Mr. Connelly's statements were involuntary and should be sup-

pressed even though police had not coerced Mr. Connelly's confession or otherwise overreached. *Id.* at 162, 107 S.Ct. 515. The Colorado trial court held that Mr. Connelly's mental illness both impaired his free will by compelling him to confess and vitiated his attempted *Miranda* waiver. *Id.* The Colorado Supreme Court affirmed, finding that Mr. Connelly's severe mental illness overbore his rational judgment and free will, making his confession involuntary and negating his ability to make a valid waiver of his rights. *Id.* That court held that the absence of police coercion or duress did not foreclose a finding that Connelly's statement was nevertheless involuntary. *Id.*

The United State Supreme Court reversed, finding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." [5] *Id.* at 167, 107 S.Ct. 515. The Court based its decision, in part, on the fact that cases considered by the Court over the 50 years preceding *Connelly* involving the constitutional privilege against compulsory self-incrimination had all "focused upon the crucial element of police overreaching." *Id.* at 163, 163 n. 1, 107 S.Ct. 515 (citing *Mincey v. Arizona*, 437 U.S. 385, 387, 396–402, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (defendant subjected to 4–hour interrogation while incapacitated and sedated in intensive-care unit); *Greenwald v. Wisconsin*, 390 U.S. 519, 519–21, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968) (defendant, on medication, interrogated for over 18 hours without food or sleep); *Beecher v. Alabama*, 389 U.S. 35, 36–38, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967) (police officers held gun

to the head of wounded confessant to extract confessions); *Davis v. North Carolina*, 384 U.S. 737, 739–53, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) (16 days of incommunicado interrogation in closed cell without windows, limited food, and coercive tactics); *Reck v. Pate*, 367 U.S. 433, 436–44, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); *Culombe v. Connecticut*, 367 U.S. 568, 569–70, 621–22, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics); *Payne v. Arkansas*, 356 U.S. 560, 561–68, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (defendant held incommunicado for three days with little food; confession obtained when police officers informed defendant that Chief of Police was preparing to admit lynch mob into jail); *Ashcraft v. Tennessee*, 322 U.S. 143, 153–55, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (defendant questioned by relays of officers for 36 hours without an opportunity for sleep)).

The Court explained that the argument that an involuntary confession violates a defendant's Constitutional rights is predicated on the Due Process Clause of the Fifth and Fourteenth Amendments and that, in other contexts, the Court has always required as part of the *prima facie* showing of a due process violation that there was some sort of *state action.* *Id.* at 165, 64 S.Ct. 921. Thus, in the context of a claim that a statement was involuntarily wrung from a defendant in violation of the Due Process Clause, the Court concluded that it was congruent with due process precedent that there be established the necessary element of state action, in this

---

**5.** "Although *Connelly* arose under the Due Process Clause of the Fourteenth Amendment, whereas the instant case appears to implicate the Fifth Amendment, the analysis in the *Connelly* decision has been extended to apply to involuntary confession claims arising under the Fifth Amendment as well." *United States v. Bad Hand*, 926 F.Supp. 891, 899 (D.S.D. 1996).

context, police coercion or overreaching. *Id.*

In addition, the Court noted that the purpose of excluding involuntary statements taken in violation of the Due Process Clause is to deter police from violating other persons' Constitutional rights in the future. *Id.* at 166., 64 S.Ct. 921 By applying the exclusionary rule in Connelly's case, in which there had been no police wrongdoing, the Supreme Court concluded that the purpose of the exclusionary rule would not be furthered. *Id.* The Court pointed out that rules of evidence, not the Constitution, exist to ferret out false or untrustworthy evidence. *Id.* at 167, 64 S.Ct. 921. The Due Process Clause seeks to prevent "fundamental unfairness" in the use of a statement, whether that statement is true or false or otherwise unreliable. *Id.* (citing *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)).

### b. Other Cases

The *Connelly* Court made clear that the Court's previous decisions in *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960), and *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) were still good law. *Connelly*, 479 U.S. at 164–65, 107 S.Ct. 515. In *Blackburn*, a defendant's statement was held to be involuntary where the police learned that the defendant had a history of mental problems and was "probably insane" at the time of his confession. *Blackburn*, 361 U.S. at 207–08, 80 S.Ct. 274. However, the evidence in that case was that the police *exploited* this weakness with coercive tactics by holding the defendant incommunicado for 8 to 9 hours of sustained interrogation in a tiny room which was, on occasion, literally filled with police. *Id.* It was these coercive tactics, not the defendant's mental condition *alone*, that supported the Court's conclusion that the confession had been wrung

from the defendant against his will. *Id.* at 206–07, 80 S.Ct. 274. Similarly, in the *Townsend* case, police administered a truth serum to the defendant and then proceeded to obtain a confession from the defendant. *Townsend*, 372 U.S. at 298–99, 83 S.Ct. 745. The *Connelly* Court pointed out that both *Blackburn* and *Townsend* supported the Court's holding that "mere examination of the confessant's state of mind can never conclude the due process inquiry." *Connelly*, 479 U.S. at 165, 107 S.Ct. 515.

Approximately six weeks after it issued its decision in *Connelly*, the Supreme Court issued another decision, *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), further explaining what it meant by police "coercion." In that case, a defendant had been told that police wanted to interrogate him about some firearms offenses. *Spring*, 479 U.S. at 566–67, 107 S.Ct. 851. The police duly advised Spring of his *Miranda* rights, which Spring waived. *Id.* Then, during the course of the interrogation, the police questioned Spring about his involvement in a murder. *Id.* at 567, 107 S.Ct. 851. Spring later argued that his waiver of his *Miranda* rights was "compelled" because he was not told at the inception that he would be questioned about the murder. *Id.* at 573, 107 S.Ct. 851. The Court rejected this argument, stating that, "[h]is allegation that the police failed to supply him with certain information does not relate to any of the traditional indicia of coercion: 'the duration and conditions of detention ..., the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance or self-control.'" *Id.* at 574, 107 S.Ct. 851 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)). Thus, the Supreme Court indicated that the physical and mental state of the defen-

dant is relevant to the inquiry as to what constitutes "coercion." *Id.*

In *United States v. Rohrbach*, 813 F.2d 142, 145 (8th Cir.1987), decided shortly after the *Connelly* decision, the Eighth Circuit Court of Appeals applied the holding in *Connelly* to affirm the district court's determination that the defendant's confession was voluntary. In *Rohrbach*, the defendant made an argument nearly identical to that advanced by Connelly, that is, that "his personal characteristics, including minimal formal education and a history of alcohol and drug abuse and of suicide attempts, are indicative of an easily overborne will." *Id.* at 144. Like the police in *Connelly*, the police in *Rohrbach* had no indication that the defendant suffered from any mental impairments or infirmities and there was no police overreaching or coercion. *Id.* The court rejected Rohrbach's argument, holding that, in light of *Connelly*, the fact that Rohrbach had not proved, or even alleged, any coercive activity by the law enforcement agents who interrogated him was fatal to his argument that his statement was involuntary. *Id.*

The Eighth Circuit came to the same conclusion in *United States v. Makes Room For Them*, 49 F.3d 410 (8th Cir. 1995), in which the defendant argued that both his confession and *Miranda* waiver were involuntary due to his lower-than-average intelligence. *Makes Room For Them*, 49 F.3d at 415. The defendant contended that his limited intellectual abilities made him more susceptible to having his will overborne. *Id.* The court rejected this argument, finding that, "[a]lthough age, education, and experience are factors in the voluntariness analysis, they are not dispositive." *Id.* The court further stated:

> We may assume for the sake of argument that Makes Room had a somewhat diminished capacity to resist pressure to waive his rights and confess. However,

this is one of two factors; we must also consider the conduct of the police. We simply do not find the requisite coercive activity here.

*Id.* (internal citations omitted).

The *Rohrbach* case contains the singular statement that, "*Connelly* makes it clear that such personal characteristics of the defendant are constitutionally irrelevant absent proof of 'coercion brought to bear on the defendant by the State.'" *Rohrbach*, 813 F.2d at 144. One might read this passage to mean that the court must first conclude that there was police coercion, considering that matter in a vacuum without reference to the defendant's characteristics, before evidence of a defendant's characteristics become relevant. However, such an interpretation is not warranted in the context of the case, nor in light of the teachings of the Supreme Court.

First of all, although *Rohrbach* states that a defendant's state of mind is irrelevant until coercion is first found, this is understandable in that the facts presented were nearly identical to the facts in *Connelly:* the police did not know the defendant had any mental infirmities, there was no outward indication of the infirmities, and there was no police coercion or overreaching. *Compare Rohrbach*, 813 F.2d at 144; *with Connelly*, 479 U.S. at 161, 107 S.Ct. 515. Under such circumstances, it is really not necessary to consider the defendant's mental conditions. Secondly, although *Rohrbach* appears to state that a defendant's state of mind is irrelevant, the court nevertheless considered the defendant's state of mind in reaching its conclusion that there had been no police overreaching or coercion. *Rohrbach*, 813 F.2d at 144–46.

A final reason that the *Rohrbach* court's statement that a defendant's state of mind is irrelevant should not be taken at face

value is that such a statement would be contrary to Supreme Court precedent, which continues to hold that the test for determining whether a defendant's statement was voluntary is the totality of circumstances. *See Withrow v. Williams,* 507 U.S. 680, 688–89, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (citing *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); and *Miller v. Fenton,* 474 U.S. 104, 109–10, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)). Indeed, earlier in the opinion, the *Rohrbach* court itself stated that the totality-of-the-circumstances was the appropriate test. *Rohrbach,* 813 F.2d at 144.

Other Eighth Circuit cases subsequent to the *Rohrbach* and *Connelly* decisions continue to examine the defendant's characteristics as part of the totality-of-the-circumstances test. *Makes Room For Them,* 49 F.3d at 415. In *Makes Room For Them,* the Eighth Circuit stated of the defendant's argument that his low intelligence and education rendered him "peculiarly susceptible to having his will overborne," that, "[c]onsidering these factors in totality, we cannot find that Makes Room's will was overborne, either as regards his confession or his *Miranda* waiver." *Id.* The court considered the defendant's characteristics as part of the totality of circumstances, even though it went on to conclude that there was no coercive activity on the part of the police. *Id.*

The decision in *Makes Room For Them* is not necessarily inconsistent with the sentence in *Rohrbach* that the defendant's state of mind was "irrelevant." Rather, the cases can be harmonized by resort to the *Connelly* decision. When the *Connelly* Court held that there must be police coercion as a necessary predicate to finding a statement to be involuntary, that did not necessarily mean that a defendant's characteristics are irrelevant. Under the totality of circumstances test, which is still the

relevant test, the defendant's characteristics are still relevant to the extent the police knew or should have known of those characteristics and deliberately exploited those characteristics. Hence, in a case like *Connelly,* where the homicide detective had no reason to know of Connelly's mental illness, the inquiry as to whether there was police coercion necessarily excludes Connelly's personal characteristics. And, in a case like *Blackburn* or *Makes Room For Them,* where the personal characteristics of the defendant are known to police or readily apparent, the courts have considered those characteristics in determining whether police engaged in coercion or overreaching. *See also United States v. Morse,* 569 F.3d 882, 885 (8th Cir.2009) (stating that voluntariness depends on the totality of circumstances, including the conduct of law enforcement officials *and* the characteristics of the accused); *Jenner v. Smith* 982 F.2d 329, 333 (8th Cir.1993) (holding that a defendant's personal characteristics bearing on her ability to resist interrogation pressures is relevant, but cannot alone render the statement involuntary without police coercion or overreaching being also present).

Indeed, although the *Connelly* Court was very clear that police coercion was *required* before a statement could be found to be involuntary, there is every indication that the Court contemplated that the defendant's mental status would still be considered in deciding *whether* police coercion existed. For example, the Court stated that, "as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntari-

ness.'" *Connelly*, 479 U.S. at 164, 107 S.Ct. 515 (citation omitted). Thus, the Court indicated that a defendant's mental status, *as it relates to police coercion*, is still relevant. And in the passage discussing the *Blackburn* and *Townsend* decisions, the Court stated that examination of the defendant's state of mind could never *conclude* the due process inquiry, thus leading to the obvious inference that a defendant's state of mind was still *part of* that inquiry. *Id.* at 165, 107 S.Ct. 515. This reading of *Connelly* is affirmed by the Court's subsequent decision in *Spring* where the Court enumerated the defendant's physical and mental condition as relevant to the inquiry regarding whether coercion had taken place. *Spring*, 479 U.S. at 574, 107 S.Ct. 851.

### c. Application of the Law to Mr. Anaya's Statements

Based on the legal analysis of *Connelly* and its progeny, the court considers all the facts and circumstances surrounding Mr. Anaya's statements in determining whether those statements were voluntary. *Withrow*, 507 U.S. at 688–689, 113 S.Ct. 1745; *Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302; and *Fenton*, ·474 U.S. at 109–10, 106 S.Ct. 445. In this context, the court also considers Mr. Anaya's personal characteristics to the extent they were known to the agents. *Blackburn*, 361 U.S. at 207–08, 80 S.Ct. 274; *Makes Room For Them*, 49 F.3d at 415; *Jenner*, 982 F.2d at 333. The court concludes that Mr. Anaya's March 12, 2009, statement was voluntary.

As an initial matter, the court notes that, for purposes of the pending motion, Dr. Manlove's ultimate conclusion that Mr. Anaya's confession was a false confession, is beside the point, although it may be relevant at the trial of this matter where

Mr. Anaya's guilt or innocence will be decided. Instead, as is evident from the above discussion, the inquiry raised by Mr. Anaya's motion is whether the police violated his constitutional rights when taking his March 12, 2009, statement.[6] That is, whether the police coerced Mr. Anaya into confessing, whether that confession has a basis in fact or not.

The court finds no evidence of the traditional indicia of coercion in the facts presented by this case. The length of the interview—approximately three and one-half hours—was not exceptional and certainly not like the periods of confinement at issue in cases like *Greenwald*, 390 U.S. at 519–21, 88 S.Ct. 1152 (defendant interrogated for 18 hours); *Davis*, 384 U.S. at 739–53, 86 S.Ct. 1761 (defendant held for 16 days of interrogation); *Reck*, 367 U.S. at 436–44, 81 S.Ct. 1541 (four days interrogation); *Culombe*, 367 U.S. at 569–70, 81 S.Ct. 1860 (five ·days interrogation); *Payne*, 356 U.S. at 561–68, 78 S.Ct. 844 (three days interrogation); or *Ashcraft*, 322 U.S. at 153–55, 64 S.Ct. 921 (36 hours non-stop interrogation).

Furthermore, Mr. Anaya first made his incriminating statement while only Agent Dawson was in the room with him. Thus, this is not a situation where Mr. Anaya's will was overcome by sheer numbers of police crowding into the room with him. *Blackburn*, 361 U.S. at 207–08, 80 S.Ct. 274.

The court also notes that Agents Dawson and Blackburn told Mr. Anaya that his participation was voluntary, that he could leave at any time, and that he only had to ask and Agent Blackburn would immediately take him back to Kyle. The evidence also shows that Mr. Anaya had sufficient intelligence and sufficient experience with

---

**6.** As the Supreme Court noted, the rules of *evidence* exist to ferret out *false* or untrustworthy evidence. *Connelly*, 479 U.S. at 167, 107 S.Ct. 515. The suppression motion calls into question constitutional issues, not evidentiary issues.

the criminal justice system, albeit the tribal system, that he could be expected to comprehend this information when it was relayed to him.

Importantly, Dr. Manlove opined (though his opinion is not binding on this court), that neither Agent Dawson nor Agent Blackburn acted with the intention of coercing Mr. Anaya into making a statement, and that neither agent deliberately exploited Mr. Anaya's anxiety condition. As *Connelly* stated, in order to find a statement to be involuntary under the Due Process Clause of the Fifth Amendment, there *must* be coercive state action. *Connelly*, 479 U.S. at 165, 107 S.Ct. 515.

Rather, the gravamen of Dr. Manlove's opinion is that Mr. Anaya's subjective belief in the infallibility of the polygraph exam, coupled with his anxiety disorder, made him more than ordinarily susceptible to feeling pressured into making a false confession. First of all, the court notes that the clear and unequivocal testimony of both Agents Dawson and Blackburn at the hearing in this matter was that they never vouched for the reliability of the polygraph exam or its admissibility in court. The agents' statements were made under oath, in open court, and subject to cross-examination.

The only evidence to the contrary is Mr. Anaya's hearsay statement made to Dr. Manlove and recorded in Dr. Manlove's report that the agents told him the polygraph was "99% reliable." This statement by Mr. Anaya was not made under oath and was not subject to cross-examination. Furthermore, it is entirely possible that nuances of what Mr. Anaya stated orally might not have been accurately captured by Dr. Manlove's written summary of what he said.[7] Finally, Agent Blackburn testified that he had never heard the 99% figure

prior to defense counsel proposing it in open court. For these reasons, and to the extent the agents' testimony conflicts with Mr. Anaya's statements to Dr. Manlove, the court credits the agents' testimony and finds that no such vouching was ever done by the agents.

The second prong of Dr. Manlove's opinion hinges on Mr. Anaya's unique susceptibility to feeling pressured because of his anxiety disorder. The facts adduced at the hearing indicate that neither Agent Dawson nor Agent Blackburn acted to exploit this condition, a conclusion also reached by Dr. Manlove. Agent Dawson asked Mr. Anaya about his health, and Mr. Anaya told Agent Dawson that he sometimes suffered from anxiety attacks. Agent Dawson testified that he followed up on this information by asking Mr. Anaya whether he had suffered an anxiety attack recently, to which Mr. Anaya replied that he had not had an anxiety attack for some period of weeks or months before March 12, 2009. Furthermore, both agents testified that they never observed any outward indication that Mr. Anaya was suffering an anxiety attack at any time during their interaction with him on March 12, 2009. The only direct evidence the court has of Mr. Anaya's mental state on this date is the tape recording of his statement. The court notes that Mr. Anaya's voice betrays no tremulousness, shaking, or other indication of anxiety. *See* Exhibit 2.

Mr. Anaya told Dr. Manlove, again not under oath and not subject to cross-examination, that he *had* in fact, suffered an anxiety attack on March 12, 2009, during his interview and that that attack caused him to want to confess so he could end the interview and end the source of his anxiety. However, this statement is not neces-

---

7. As, for example, we saw in Agent Dawson's written summary of his conversation with Mr. Anaya in which certain details which elaborated on the main data were not captured. *See* Exhibit 4, and the discussion in the Facts section of this opinion.

sarily in conflict with the agents' testimony.

Dr. Manlove pointed out that a person may suffer an anxiety attack and show no outward, objective, or visible signs that he is so suffering. Since the pertinent question here is whether the police acted coercively or overreached, the inquiry is what the police observed and acted upon. Just as in *Connelly* and *Rohrbach*, if the police are unaware that the defendant is experiencing something inwardly that affects the defendant's free will, the police are not guilty of coercion. *Connelly*, 479 U.S. at 165–67, 107 S.Ct. 515; *Rohrbach*, 813 F.2d at 144–45. Here, Agent Dawson took the prophylactic step of making inquiry of Mr. Anaya's condition and Mr. Anaya assured Agent Dawson that he was not under unusual stress. If that circumstance changed later on during the interview, it cannot be said that Mr. Anaya's failure to inform Agent Dawson of the change amounted to coercion on Agent Dawson's part.

Mr. Anaya also told Dr. Manlove that he felt coerced by the fact that Agent Dawson sat "uncomfortably close" to him during the interview, a distance that Mr. Anaya estimated to be two to three feet. Sitting next to a person at a distance of two to three feet inside an office that is only 10 feet by 8 feet and has a desk and three chairs in it does not strike the court as unusual. Furthermore, Mr. Anaya never indicated that Agent Dawson loomed over the top of him, threatened him physically, or coupled his close physical proximity with a raised voice or threatening words. Again, given the totality of facts surrounding this interview, the court cannot conclude that Agent Dawson's sitting two to three feet away from Mr. Anaya served to overbear his free will.

 Finally, the court notes that one of the subtle elements of coercion found by Dr. Manlove was that the agents promised leniency. The court notes that the agents' only testimony on this point at the hearing was that they told Mr. Anaya that if he cooperated, they would pass along the fact that he had cooperated to the prosecutor. The agents never represented that this would result in no charges being filed, lesser charges being filed, or a less drastic punishment. In any case, the Eighth Circuit has indicated that promises of leniency do not necessarily render a confession involuntary. *Kilgore*, 58 F.3d at 353. Here, given the totality of the circumstances, the fact that the agents told Mr. Anaya that they would pass along to the prosecutor the fact that he had cooperated does not serve to render Mr. Anaya's statement involuntary.[8]

It cannot be denied that the very fact of being questioned by law enforcement while in custody is inherently coercive, a fact which prompted the Supreme Court to establish the prophylactic rule in *Miranda*. *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. In addition, the court agrees that submitting to a polygraph examination may also present a somewhat coercive condition. So, too, the fact that there is a racial imbalance between interrogator and suspect. But Mr. Anaya cites to no case and this court is not aware of such a case that has found coercion based only on these factors.

Instead, the court is required to consider all relevant factors and to determine whether, under all factors, the conclusion

---

8. Mr. Anaya's counsel's suggestion in his brief on his motion to suppress that Mr. Anaya may have been intoxicated at the time of the March 12, 2009, interview appears specious. Mr. Anaya himself told Dr. Manlove that he had not drunk any alcohol for two days prior to the interview and that, on the occasion when he did drink two days prior, he consumed only two alcoholic drinks. *See* Exhibit 101, page 6.

can be reached that the defendant's free will was overborne. Considering the totality of circumstances surrounding the March 12, 2009, interview of Mr. Anaya, the court concludes that the agents did not overbear his free will and that the statements Mr. Anaya made on this occasion were freely and voluntarily made. Accordingly, the court recommends that this portion of Mr. Anaya's motion to suppress be denied.

### 3. Whether Mr. Anaya Voluntarily Waived His *Miranda* Rights

Mr. Anaya also argues that his waiver of his *Miranda* rights was not voluntary, knowing, or intelligent. Neither party disputes that *Miranda* warnings were given prior to the questioning in this case. Thus, whether Mr. Anaya's statements should be suppressed pursuant to the rule in *Miranda* depends on whether Mr. Anaya effectuated a valid waiver of his *Miranda* rights prior to giving his statement to Agents Dawson and Blackburn.

 It is the government's burden to prove that a defendant's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. *United States v. Caldwell,* 954 F.2d 496, 508 (8th Cir.1992). "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda,* 384 U.S. at 475, 86 S.Ct. 1602. The government must prove that a waiver was voluntary, knowing, and intelligent by a preponderance of the evidence. *Connelly,* 479 U.S. at 168, 107 S.Ct. 515.

Whether Mr. Anaya effectively waived his *Miranda* rights requires two inquiries: First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *United States v. Jones,* 23 F.3d 1307, 1313 (8th Cir.1994) (quoting *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

 "Only if the 'totality of circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Jones,* 23 F.3d at 1313. Examination of the totality of circumstances includes, but is not limited to, such considerations as the "background, experience, and conduct" of the defendant. *Jones,* 23 F.3d at 1313 (quoting *United States v. Barahona,* 990 F.2d 412, 418 (8th Cir.1993)).

#### a. Whether Mr. Anaya's *Miranda* Waiver was Voluntary

 The same analysis concerning the voluntariness of a defendant's confession under the Fifth Amendment applies to determine whether a defendant's *Miranda* waiver was voluntary. *See Makes Room for Them,* 49 F.3d at 415 (a court must consider the conduct of the police when determining whether defendant's will was overborne with regard to either his confession or his *Miranda* waiver). Under either analysis, "[a]bsent evidence that [defendant's] will [was] overborne and his capacity for self-determination critically impaired *because of* coercive police conduct," a waiver of *Miranda* rights will be considered voluntary. *Spring,* 479 U.S. at 574, 107 S.Ct. 851 (emphasis supplied). The court has already determined that Agents Dawson and Blackburn did not coerce or threaten Mr. Anaya in any way

to elicit his statements, and that there was no coercion or overreaching. The facts surrounding Mr. Anaya's *Miranda* waiver are even more compelling as the coercive aspect of undergoing the polygraph exam was not a factor at all in the *Miranda* waiver as the exam was conducted *after* Mr. Anaya waived his *Miranda* rights. Therefore, the court concludes that the agents did not coerce Mr. Anaya into waiving his *Miranda* rights. Mr. Anaya freely and voluntarily waived his *Miranda* rights.

### b. Whether Mr. Anaya's *Miranda* Waiver was Knowing and Intelligent

▮▮▮ With regard to this second inquiry, whether Mr. Anaya made a knowing and intelligent waiver, "[a] waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right ..." *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir.2005). Although police coercion is a necessary predicate to finding that a waiver was involuntary, it is *not* determinative on the separate issue of whether the waiver was knowing and intelligent. *United States v. Turner*, 157 F.3d 552, 555(8 th Cir.1998).

▮▮▮ "As a general matter ... an accused who is admonished with the warnings prescribed by this Court in *Miranda* has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one ..." *United States v. Garlewicz*, 493 F.3d 933, 936 (8th Cir.2007). "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of

law." *Moran*, 475 U.S. at 422–23, 106 S.Ct. 1135.

The Court in *Miranda* explained further:

At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it—the threshold requirement for an intelligent decision as to its exercise. More important, such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere....

The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege.

*Miranda*, 384 U.S. at 467–69, 86 S.Ct. 1602.

Mr. Anaya argues that his lack of legal sophistication and anxiety disorder vitiated his ability to knowingly and intelligently waive his constitutional rights. The Eighth Circuit decision in *Turner*, 157 F.3d 552, lends guidance.

In *Turner*, police officers stopped Turner's vehicle after observing erratic driving. *Id.* at 553. Officers administered field sobriety tests to Turner and concluded that he was under the influence of some drug other than alcohol. *Id.* at 554. After arresting Turner and advising him of his *Miranda* rights, officers transported him to jail and conducted a urine test, which came back positive for phencyclidine (PCP). *Id.*

Officers again advised Turner of his *Miranda* rights and Turner signed a waiver form, initialing each admonition. *Id.* During the interview, Turner appeared cooperative; however, he subsequently exhibited bizarre behavior. *Id.* Upon examination, several psychiatrists diagnosed Turner with a having a PCP-induced psychotic disorder and an intelligence quotient ("IQ"), in the low-average to borderline range. *Id.* Turner moved to suppress the statements he made to law enforcement, arguing that, because of his low IQ, PCP intoxication, and mental illness, he did not have the mental capacity to intelligently and knowingly waive his constitutional rights. *Id.*

The court rejected this argument, finding the following facts persuasive: Turner was cooperative during the interview; he reviewed and initialed each admonition of the waiver form; he agreed to answer questions; he gave accurate information; and he appeared intelligent enough to understand his rights. *Id.* at 555. *See also North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver ..."); *Rohrbach,* 813 F.2d at 145 (in determining that defendant's waiver was knowing and intelligent, the court found persuasive the fact that his history of arrests, convictions, and reform school made him quite familiar with the criminal justice system). The *Turner* court concluded that Turner's waiver of his *Miranda* rights was knowing and intelligent. *Turner,* 157 F.3d at 557.

The advisement of rights given by Agent Dawson in this case to Mr. Anaya fully and fairly described Mr. Anaya's *Miranda* rights. Furthermore, it did so in plain and simple language. The evidence shows that Mr. Anaya graduated from high school with an above-average grade point average of 3.2. The language used by Agent Dawson to describe Mr. Anaya's *Miranda* rights was appropriate for a high school graduate to understand. Mr. Anaya indicated he *did* understand his rights. Furthermore, Agent Dawson and Agent Blackburn's colloquies with Mr. Anaya on a variety of topics revealed a level of cooperation and intelligence on Mr. Anaya's part sufficient to support the conclusion that, when Mr. Anaya said he understood his rights, he actually did.

■ It is true that Agent Dawson did not specifically tell Mr. Anaya that he was there to investigate potential federal charges, as opposed to tribal charges, for which the maximum penalty would be that of a misdemeanor. The Eighth Circuit has rejected the argument "that Miranda requires a specific warning on the potential sentencing consequences of waiving the right to remain silent." *United States v. Johnson,* 47 F.3d 272, 277 (8th Cir.1995). A defendant "must show more than that he misunderstood the extent of his waiver or its ramifications ..." *United States v. Sanders,* 341 F.3d 809, 817 (8th Cir.2003). "Lack of awareness of the potential adverse impact of statements is not sufficient in itself to invalidate a waiver of the right to counsel." *United States v. Peck,* 161 F.3d 1171, 1174 (8th Cir.1998).

In *United States v. Kilgore,* 58 F.3d 350 (8th Cir.1995), the Eighth Circuit held that the defendant's confession was voluntary even if he "was confused and confessed to the crime on the mistaken belief that he had been promised leniency (or even if he had been promised some form of leniency)." *Id.* at 353. In *Spring,* the Supreme Court found that the agents' failure to tell Spring at the inception of the interview that they were going to ask him questions about his involvement in a murder did not invalidate Spring's knowing and intelligent

*Miranda* waiver. *Spring,* 479 U.S. at 574, 107 S.Ct. 851.

Here, Agent Dawson informed Mr. Anaya that he was there to interview him regarding the victim's allegations of sexual abuse. Furthermore, Agent Dawson informed Mr. Anaya that he was an FBI agent. Agent Dawson was under no legal obligation to tell Mr. Anaya that federal charges would be filed if criminal acts were discovered or what the possible penalties for those charges might be. Indeed, until the investigation was completed, it would be nearly impossible for Agent Dawson to determine what charges, if any, were supported by the evidence. Without being able to determine if any federal charges were supported by the evidence, it would also have been impossible for Agent Dawson to determine what the penalties for those charges might be. Agent Dawson's failure to tell Mr. Anaya that he faced potential federal charges and the penalties for those charges does not render Mr. Anaya's waiver of his *Miranda* rights invalid. *Spring,* 479 U.S. at 574, 107 S.Ct. 851; *Sanders,* 341 F.3d at 817; *Peck,* 161 F.3d at 1174; and *Kilgore,* 58 F.3d at 353.

### CONCLUSION

This court respectfully recommends that Mr. Anaya's motion to suppress [Docket No. 21] be denied in all respects.

### NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained. *See* Fed.R.Crim.P. 59(b); 28 U.S.C. § 636(b)(1)(B). Failure to file timely objections will result in the waiver of the right to appeal questions of fact. *Id.* Objections must be timely and specific in order to require *de novo* review by the district court. *See Thompson v. Nix,* 897 F.2d 356 (8th Cir.1990); *Nash v. Black,* 781 F.2d 665 (8th Cir.1986).

Dated April 19, 2010.